LEHIGH AND NEW ENGLAND RAIL-
WAY COMPANY, Petitioner,

v.

INTERSTATE COMMERCE
COMMISSION and United
States, Respondents,

Commonwealth of Pennsylvania,
Intervenor.

No. 75–1518.

United States Court of Appeals,
Third Circuit.

Argued Feb. 24, 1976.

Decided June 9, 1976.

Robert E. Turtz, Carpenter, Bennett & Morrissey, Richard B. Wachenfeld, Newark, N. J., for petitioner.

John H. Broadley, Thomas E. Kauper, Henri F. Rush, Fritz R. Kahn, I.C.C., Washington, D. C., for respondents.

Robert P. Kane, Michael von Moschzisker, Lawrence Barth, Asst. Atty. Gen., Philadelphia, Pa., Gordon P. MacDougall, Washington, D. C., for intervenor.

Before ADAMS, HUNTER and GARTH, Circuit Judges.

## OPINION OF THE COURT

JAMES HUNTER, III, Circuit Judge:

The Lehigh and New England Railway Company ("L&NE") petitions this court to review and set aside an order of the Interstate Commerce Commission ("ICC") entered in Ex Parte No. 293 (Sub–No. 3), entitled "Submission of Cost Data to Justify Reimbursement," and cost form regulations, 49 C.F.R. § 1126, promulgated by that order.[1] The regulations sought to implement section 1(16)(b) of the Interstate Commerce Act, 49 U.S.C. § 1(16)(b) (Supp. IV, 1974), which permits the Commission, in certain specified instances, to direct a railroad carrier to operate temporarily over the lines of another carrier unable or unwilling to provide essential rail service. L&NE challenges the regulations insofar as they fail to provide for the payment of rent, except in certain limited circumstances, to the railroad unable or unwilling to continue service for the use of its properties by the carrier directed by the ICC to operate temporarily on those properties. The Commonwealth of Pennsylvania has intervened in general support of the regulations. For the reasons set forth below, we deny L&NE's

---

1. We have jurisdiction to review the Commission's regulations by virtue of 28 U.S.C. §§ 2321(a), 2342(5) (Supp. IV, 1974).

petition to review and set aside the regulations.

## I.

### A. Section 1(16)(b) and the Cost Reimbursement Regulations

Section 1(16)(b) of the Interstate Commerce Act, 49 U.S.C. § 1(16)(b),[2] grants the ICC emergency authority to make just and reasonable directions with respect to the handling, routing and movement of traffic available to a railroad carrier that is unable to transport the traffic offered it because (1) its cash position makes continued operation impossible, (2) it has been ordered by a court to discontinue service or (3) it has abandoned service without prior Commission approval. Specifically, the ICC may direct a carrier (hereinafter the "directed carrier") to operate over the lines of the carrier unable to transport its own traffic (hereinafter the "other carrier"). The duration of this directed service is specifically limited to 60 days, unless extended by the ICC for cause shown for an additional period not to exceed 180 days. 49 U.S.C. § 1(16)(b)(A).

Subsection (b) was added to section 1(16) of the Interstate Commerce Act by section 601(e) of the Regional Rail Reorganization Act of 1973 ("Rail Act").[3] The legislative

2. Section 1(16)(b) provides:

(b) Whenever any carrier by railroad is unable to transport the traffic offered it because—

(1) its cash position makes its continuing operation impossible;

(2) it has been ordered to discontinue any service by a court; or

(3) it has abandoned service without obtaining a certificate from the Commission pursuant to this section;

the Commission may, upon the same procedure as provided in paragraph (15) of this section, make such just and reasonable directions with respect to the handling, routing, and movement of the traffic available to such carrier and its distribution over such carrier's lines, as in the opinion of the Commission will best promote the service in the interest of the public and the commerce of the people subject to the following conditions:

(A) Such direction shall be effective for no longer than 60 days unless extended by the Commission for cause shown for an additional designated period not to exceed 180 days.

(B) No such directions shall be issued that would cause a carrier to operate in violation of the Federal Railroad Safety Act of 1970 or that would substantially impair the ability of the carrier so directed to serve adequately its own patrons or to meet its outstanding common carrier obligations.

(C) The directed carrier shall not, by reason of such Commission direction, be deemed to have assumed or to become responsible for the debts of the other carrier.

(D) The directed carrier shall hire employees of the other carrier to the extent such employees had previously performed the directed service for the other carrier, and, as to such employees as shall be so hired, the directed carrier shall be deemed to have assumed all existing employment obligations and practices of the other carrier relating thereto, including, but not limited to, agreements governing rate of pay, rules and working conditions, and all employee protective conditions commencing with and for the duration of the direction.

(E) Any order of the Commission entered pursuant to this paragraph shall provide that if, for the period of its effectiveness, the cost, as hereinafter defined, of handling, routing, and moving the traffic of another carrier over the other carrier's lines of road shall exceed the direct revenues therefor, then upon request, payment shall be made to the directed carrier, in the manner hereinafter provided and within 90 days after expiration of such order, of a sum equal to the amount by which such cost has exceeded said revenues. The term "cost" shall mean those expenditures made or incurred in or attributable to the operations as directed, including the rental or lease of necessary equipment, plus an appropriate allocation of common expenses, overheads, and a reasonable profit. Such cost shall be then currently recorded by the carrier or carriers in such manner and on such forms as by general order may be prescribed by the Commission and shall be submitted to and subject to audit by the Commission. The Commission shall certify promptly to the Secretary of the Treasury the amount of payment to be made to said carrier or carriers under the provisions of this paragraph. Payments required to be made to a carrier under the provisions of this paragraph shall be made by the Secretary of the Treasury from funds hereby authorized to be appropriated in such amounts as may be necessary for the purpose of carrying out the provisions hereof.

3. 87 Stat. 986, 1021. Prior to the addition of subsection (b), section 1(16) did not specifically authorize the ICC to direct a carrier to operate over the lines of another carrier that was unable to transport the traffic offered it.

history of the Rail Act has been extensively documented by other courts and will not be reviewed here.[4] It is sufficient to state that the Act was a congressional attempt to provide imaginative and innovative solutions to avoid a national disaster threatened by the bankruptcy of railroads in Northeastern United States. Subsection (b) was considered necessary to ensure that essential rail service provided by the bankrupt carriers in the Northeast would be continued pending development and implementation of a longer term reorganization of the bankrupt lines.[5]

Section 1(16)(b)(E) permits the directed carrier to recover from the government, upon request, a sum equal to the amount by which the cost of directed operations exceeds the revenues derived from that operation. "Cost" is defined by subsection (E) as "those expenditures made or incurred in or attributable to the operations as directed, including the rental or lease of necessary equipment, plus an appropriate allocation of common expenses, overheads, and a reasonable profit." The subsection requires the ICC to prescribe a form on which the directed carrier can record costs and revenues of the directed operation and which must then be submitted by the directed carrier to the Commission for audit. The ICC then is authorized to certify to the Secretary of Treasury the amount of payment to be made to the directed carrier.

In an effort to implement section 1(16)(b), the ICC issued on April 9, 1975, effective March 21, 1975[6] a form for the recordation of costs and revenues by the directed carrier, rules governing the procedure for submission of cost data, and a report setting forth the Commission's policy on what costs and revenues, incurred in or attributable to the conduct of directed operations, are allowable for purposes of inclusion in the cost form.[7] ICC viewed its role under section 1(16)(b) as follows:

> The Commission views its role as that of mediator between the directed carrier

4. *See, e. g., Regional Rail Reorganization Act Cases*, 419 U.S. 102, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974), *Connecticut General Ins. Corp. v. United States Railway Ass'n*, 383 F.Supp. 510 (E.D.Pa.) (three-judge court), *rev'd*, 419 U.S. 102, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974); *In re Penn Central Transportation Co.*, 384 F.Supp. 895 (Regional Rail Reorganization Act Special Court 1974).

5. The Senate Report accompanying the Rail Act stated:
 > The purpose of subsection (e) is to assure the continuance of essential rail service in the Northeast and Midwest region in case one or more of the seven railroads presently in reorganization under section 77 of the Bankruptcy Act ceases operations prior to the adoption, approval, and implementation of the final system plan. By authorizing the Commission to direct a carrier to operate over the lines of a non-operating carrier for an interim period, transportation chaos and economic disaster can be avoided while the planning and implementation process provided for in the bill moves forward in a careful and orderly manner.

 S.Rep.No.93–601, 93d Cong., 1st Sess. 52–53 (1973), *reprinted in* 2 U.S.Code Cong. & Admin. News, p. 3242 (1973).

6. The ICC had commenced a rulemaking proceeding known as Ex Parte No. 293 (Sub-No. 3) on July 11, 1974 for the purpose of promulgating the cost form and regulations. Representatives of the railroad industry, including the Central Railroad Company of New Jersey ("CNJ") but not L&NE, shippers and labor participated in the proceedings.

7. The cost form and rules, but not the report, are found, in 49 C.F.R. § 1126. The ICC report, "Implementation of Public Law 93–236, Section 601(e), Regional Rail Reorganization Act of 1973—Submission of Cost Data to Justify Reimbursement," ("Report") appears at 348 I.C.C. 251 & 320 (1975). The relationship of the Report to the cost form was stated by the ICC as follows:
 > The comments and discussions in the report and order of the Commission accompanying this cost form, while not an integral part of the cost form itself, shall be used by a directed carrier applying the cost form as guidance in recording revenues and expenses and as a general statement of Commission policy, subject to revision, regarding emergency directed service under section 1(16)(b) of the Interstate Commerce Act, as amended by section 601(e) of the Regional Rail Reorganization Act of 1973. ICC Report, Joint App. at A–199.

 All references in this opinion to "cost reimbursement regulations" include the cost form, its regulations and the Report. All citations to the Report are to the Joint Appendix of Petitioner.

and the other carrier in terms of charges to which they must mutually agree and as that of overseer of the general reasonableness of expenses incurred in performance of a directed operation, and hopes that, with the cooperation of all parties, it can maintain that limited role. The standards established in the final cost form are intended to simplify and standardize the admittedly complex accounting procedures imposed upon a directed carrier and to limit those expenditures which may be reimbursable by the Federal government to those essential to performance of a directed service within the guidelines established by section 1(16)(b) itself and within the clear intent of Congress to keep Federal expenditures to a minimum.[8]

As is pertinent to the instant controversy, in its Report the ICC considered the question whether it should recognize rent paid by the directed carrier to the other carrier for use of its facilities as a reimbursable cost under section 1(16)(b). The Commission concluded that in the usual case, where the directed carrier's costs of directed operations exceeded revenues, no compensation or rent for the use of the other carrier's lines and facilities would be required and thus a directed carrier would not be reimbursed by the government for any rent paid to the other carrier.[9] The practical effect of this rule is to deny the other carrier rent for the use of its lines and facilities during the period of an unprofitable directed operation. Where the costs of directed operations do not exceed revenues, i. e., a profitable operation, the Report provides that rent should be paid to the other carrier by the directed carrier. In this event, the amount of rent would be measured by the lessening of the other carrier's economic value due to the directed operations (i. e., normalized depreciation), reduced by amounts expended during the period of directed service that benefited the other carrier or its estate.[10]

The Commission stated two reasons for its denial of rent to the other carrier in the usual case. First, it believed that by ordering directed service it was fulfilling the other carrier's legal obligation to continue service until obtaining a certificate of abandonment from the ICC and that to permit reimbursement for rent would provide a monetary incentive for the "unlawful abandonment of service." Second, the Commission was of the view that its ordering of directed service would confer substantial benefits on the other carrier which in most instances would be sufficient to discharge any obligation to pay rent.[11]

L&NE instituted these proceedings on May 20, 1975 to set aside that portion of the ICC's cost reimbursement regulations which denies rent to the other carrier when directed operations are not profitable.

### B. *Service Orders 1207 & 1208*

L&NE's interest in the Commission's refusal to reimburse a directed carrier, in the usual case, for rent paid the other carrier during the period of directed service can be traced to two orders issued by the ICC, Service Orders 1207 and 1208. A review of events leading up to and surrounding the issuance of these orders, which directed the Reading Company and the Lehigh Valley Railroad Company ("LVRR") to operate for a limited period of time over the lines of L&NE, is necessary to an understanding of the instant controversy.[12]

8. ICC Report, Joint App. at A–165 to –166.

9. *Id.* at A–173 to –174. The Commission further stated, however, that where "rental agreements already exist under which the other carrier leases lines or properties, . . . for its operations, the directed carrier shall pay the existing rental for those lines and other properties which are necessary to the performance of a directed operation, and such payments shall be recognized as a reimbursable cost. . ." *Id.* at A–170.

10. *Id.* at A–174 to –175.

11. *Id.* at A–171 to –174, see notes 28 & 29, *infra*.

12. This action was instituted by L&NE, as it candidly admits, primarily to clear the way for a suit against the United States in the Court of Claims based on L&NE's contention that Service Orders 1207 and 1208 constituted a taking of L&NE's property for which just compensation is required. L&NE brought the instant

L&NE is a carrier by railroad whose lines are located solely within the Commonwealth of Pennsylvania.[13] In 1972, L&NE, because of a decrease in coal and cement traffic, experienced a substantial decline in net income and by 1973 it was operating at an annual deficit of over $100,000.[14] Because of these losses, representatives of L&NE and CNJ allegedly approached the ICC in the latter part of December 1974 to determine whether the Commission would be willing to enter an order directing another railroad to provide service over L&NE's lines.[15] L&NE indicated that according to its projections for 1975 operating losses ranging up to as much as $400,000 might be expected for the first six to nine months of 1975. L&NE further indicated its intention to embargo all traffic to, from and over its lines, effective January 24, 1975. Brief for Respondent at 21.

During meetings in December and in the early part of January various alternatives to directed service were discussed by the ICC, L&NE and shippers in L&NE's area, but no solution was reached. On January 7, 1975, L&NE issued an embargo covering all traffic moving from, to and over its lines, effective January 24, 1975. To avoid the disruption that would result from implementation of the embargo, the ICC entered Service Orders 1207 and 1208 on January 17, 1975, which directed LVRR and Reading to provide service over L&NE's lines for 60 days (from January 24 to March 24, 1975). The service orders were subsequently extended for an additional 180 days (from March 24 to September 21, 1975) by the Commission after being notified on March 3, 1975 that L&NE would not be able to resume operations upon the expiration of the original service orders.[16]

The Service Orders required the directed carriers, LVRR and Reading, and L&NE "to negotiate . . . agreement[s] . . . on all aspects of the directed operation subject to their determination," and subject to Commission approval.[17] During these negotiations, L&NE sought to be paid rent for the use of its facilities during the

proceeding first because it feared that the Court of Claims might view L&NE's suit for just compensation as a collateral attack on the ICC regulation. Brief for Petitioner at 15 n.*. We, of course, express no opinion as to the effect of our decision on any action that might be instituted in the Court of Claims.

13. L&NE was formed in 1961 as a wholly owned subsidiary of the Central Railroad Company of New Jersey ("CNJ"). Following a default by CNJ of certain loans guaranteed by the ICC, all L&NE stock, bonds and equipment were transferred to, and registered in the name of, the United States. Nevertheless, the CNJ Trustee continues to vote the L&NE stock and manage the L&NE on a day-to-day basis without supervision by the United States Department of Justice.

The recent conveyance of certain railroads in the Northeast and Midwest on April 1, 1976 to ConRail under the "Final System Plan" adopted pursuant to the Rail Act has had no effect on the instant litigation. While the implementation of the Final System Plan resulted in a transfer of certain assets of L&NE to ConRail, L&NE's corporate status remains unmodified. In addition, ConRail did not acquire the stock of L&NE and L&NE's corporate relationship both to CNJ and to the United States has remained unaffected.

14. *In re Application of Lehigh and New England Railway Company*, Under Section 1, Paragraphs (18) to (20), Inclusive, of the Interstate Commerce Act, as Amended, For a Certificate of Public Convenience and Necessity Authorizing Abandonment of Operations, at 10 & Exhibit 2b, (filed Sept. 8, 1975), *reprinted in* Exhibit I to Brief of Respondent.

15. L&NE disputes the government's assertion that it solicited or requested the Commission to order directed service. Letter from Carpenter, Bennett & Morrissey to Thomas F. Quinn, Clerk of the United States Court of Appeals for the Third Circuit, at 2, Apr. 8, 1976.

16. L&NE sent copies of its letter to the ICC to all shippers and receivers of freight in the area with the suggestion that "[i]f the continuation of these services is essential to your company, I would suggest that you get in touch with Mr. Brooks [at the ICC] . . . and urge that the Interstate Commerce Commission extend the termination dates." Brief for Respondent at 25. Apparently, these shippers followed L&NE's advice and contacted the ICC to demonstrate their need for continued rail services. *Id.*

17. Corrected Revised Service Orders 1207 & 1208, *reprinted in* Brief of Petitioner, Exhibits I & II, at 5.

period of directed service. Negotiations broke down after the ICC advised the parties that no basis had been shown for allowing rent to L&NE. Shortly thereafter, the instant proceeding was commenced by L&NE.

On September 9, 1975, immediately prior to the expiration of Service Orders 1207 and 1208 as extended, L&NE filed for the first time an "Application for Authority to Abandon Operations." Thereafter, an agreement was reached between L&NE and LVRR and Reading whereby the two carriers would continue to provide service over L&NE's lines "on a 'no-loss guaranty basis.'" The agreement was underwritten by funds provided by the United States Department of Transportation under section 213 of the Regional Rail Reorganization Act of 1973, 45 U.S.C. § 723 (Supp. IV, 1974).

In November of 1975, LVRR and Reading submitted claims for reimbursement of costs in excess of revenues that resulted from the directed operations under Service Orders 1207 and 1208. The amounts claimed reflected total operating losses of $325,891.15, of which $120,372.88 consisted of maintenance of way expenses required to permit safe operations over L&NE's properties.[18] Brief for Respondent at 26.

## II.

L&NE makes several arguments in support of its petition to set aside the Commission's regulations regarding reimbursement for rent charged by the other carrier. First, it contends that the ICC exceeded its rulemaking authority under section 1(16)(b) by determining what costs are reimbursable because that section authorizes the Commission only to prescribe a form for recordation of costs as defined in section 1(16)(b) and does not grant it authority to make sub-

stantive rules. Second, L&NE asserts that directed service constitutes a taking of property for a public use within the meaning of the fifth amendment and that the Commission's rules concerning reimbursement for rent deprive the other carrier of the just compensation to which it is entitled under the fifth amendment.[19] As a subsidiary argument, L&NE claims that by adopting a rule that rent is payable only where the directed service is profitable, the ICC has usurped the judicial function of determining what constitutes just compensation. Finally, L&NE attacks as arbitrary and capricious the regulations' distinction between profitable and unprofitable operations for payment of rent and the method of calculating the amount of rent to be paid in the event of a profitable operation.

The Commission contends first that L&NE is equitably estopped from attacking Service Orders 1207 and 1208 as constituting a taking and the cost reimbursement regulations as providing inadequate compensation because L&NE sought and obtained substantial benefits from the directed operations. The authority to adopt regulations determining what expenditures constitute reimbursable costs under section 1(16)(b) is found, the Commission asserts, both in its inherent power to supervise the flow of federal funds to railroads and in the preamble to the Rail Act, in which Congress expressed its desire to provide federal assistance to railroads at the lowest possible cost to the general taxpayer. 45 U.S.C. § 701(b)(6) (Supp. IV, 1974). The ICC disputes L&NE's assertion that directed service effects a taking under the fifth amendment; it contends that by ordering directed service the Commission is merely fulfilling the other carrier's obligation to continue rail service until receiving a certificate of abandonment and that in the usual case the

---

**18.** In addition $51,232.51 was expended by LVRR, with prior ICC approval, to rehabilitate L&NE's tracks to conform them to safe operating standards.

**19.** L&NE does not challenge the constitutionality of either directed service under section 1(16)(b) or Service Orders 1207 and 1208. Reply Brief for Petitioner at 3. Nor does L&NE

ask this court to determine the amount of compensation to which it is entitled should we conclude that directed service constitutes a taking within the meaning of the fifth amendment; L&NE has stated that it will bring suit in the Court of Claims to resolve this question. See note 12 *supra*.

other carrier receives substantial benefits as a result of directed service,[20] which benefits constitute just compensation as a matter of law. Finally, the ICC asserts that L&NE lacks standing to challenge those portions of the regulations concerning the payment of rent in the event of a profitable operation because such a situation is only a hypothetical one and because there is currently pending before the Commission a challenge to those portions of the regulations.

### III.

#### A. Equitable Estoppel

The Commission argues that L&NE cannot now be permitted to attack the cost reimbursement regulations because it actively sought directed service and still retains substantial benefits resulting from the directed operations. In support of its argument, the ICC quotes a statement by the Supreme Court in *FPC v. Colorado Interstate Gas Co.*, 348 U.S. 492, 502, 75 S.Ct. 467, 473, 99 L.Ed. 583 (1955) that a plaintiff "cannot now be allowed to attack an officially approved condition of the merger while retaining at the same time all of its benefits." [21]

■ On the record before us, we cannot rely on the estoppel doctrine to avoid reaching the difficult issues raised in L&NE's petition. *FPC* is inapposite. In that case the party which sought the merger was aware prior to accepting the merger's benefits of the conditions imposed on the merger by the government.[22] There is no evidence in the record that prior to accepting directed service, L&NE was aware that it would not receive compensation for the directed carrier's use of its properties. The service orders were issued on January 17, 1975 and extended on March 21, 1975, but the ICC did not issue its cost form regulations and report until April 9, 1975, effective March 21, 1975. In addition, paragraph (i) of each service order provided that the directed carrier and L&NE were to negotiate an agreement "on all aspects of the directed operation subject to their determination, including, but not limited to . . . rental for the use of rights-of-way and other rail facilities." [23] Finally, L&NE disputes the ICC's assertion that it sought or requested directed service.[24]

#### B. ICC Authority to Determine Reimbursable Costs

■ The ICC, like other administrative agencies, is of course a creature of statute and cannot exceed the specific statutory authority granted it by Congress.[25] While the precise wording of section 1(16)(b)(E) could be construed, as L&NE asserts, to grant the Commission only the ministerial duty to prescribe a mere form for the recordation of cost and revenue figures, we reject such a narrow view of ICC authority here. In our view the Commission's authority to determine what are reimbursable

---

**20.** The benefits perceived by the ICC to have flowed to L&NE as a result of directed service are: (1) L&NE was relieved of further operating losses during this period; (2) its rail properties were prevented from further deterioration; (3) its properties were upgraded to safe operating standards; (4) directed service led directly to agreements between L&NE and LVRR and Reading to continue service over L&NE's lines; and (5) directed service facilitated inclusion of L&NE's properties in the Final System Plan. Brief for Respondent at 40–41.

**21.** *See also Irregular Route Carriers Ass'n v. United States*, Civil No. 4–72214 (E.D.Mich. Sept. 5, 1974) (three-judge court) (oral opinion), Exhibit II of Brief of Respondent; *Admiral-Merchants Motor Freight, Inc. v. United States*, 321 F.Supp. 353 (D.Colo.1971) (three-

judge court), *aff'd per curiam*, 404 U.S. 802 (1972).

**22.** 348 U.S. at 502, 75 S.Ct. 467.

**23.** Corrected Revised Service Orders 1207 & 1208, Brief for Petitioner, Exhibits I & II, at 5.

**24.** *See* note 15 *supra*.

**25.** *American Trucking Ass'ns, Inc. v. United States*, 242 F.Supp. 597, 600 (D.D.C.1965) (three-judge court), *aff'd*, 382 U.S. 373, 86 S.Ct. 543, 15 L.Ed.2d 422 (1966). *See generally Zuber v. Allen*, 396 U.S. 168, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969); *CAB v. Delta Air Lines, Inc.*, 367 U.S. 316, 81 S.Ct. 1611, 6 L.Ed.2d 869 (1961); *Reardon v. United States*, 491 F.2d 822 (10th Cir. 1974).

costs, while not explicitly set forth in the Rail Act or section 1(16)(b), is fairly implied, assuming a reasonable exercise of that authority. *See American Iron & Steel Institute v. EPA*, 526 F.2d 1027, 1037 (3d Cir. 1975); *Niagara Mohawk Power Corp. v. FPC*, 126 U.S.App.D.C. 376, 379 F.2d 153, 158 (1967); *Akron, Canton & Youngstown R. R. v. United States*, 370 F.Supp. 1231, 1235–36 (D.Md. 1974) (three-judge court). We consider a reading of section 1(16)(b) to limit Commission power in determining reimbursable costs to be unwarranted absent compelling evidence that such was Congress's intent. *See United States v. Southwestern Cable Co.*, 392 U.S. 157, 177, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968); *Permian Basin Area Rate Cases*, 390 U.S. 747, 780, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968); *American Trucking Associations, Inc., v. Atchison, Topeka & Santa Fe Ry.*, 387 U.S. 397, 409–12, 87 S.Ct. 1608, 18 L.Ed.2d 847 (1967).

In support of our conclusion, we note that the Commission is given the authority in section 1(16)(b)(E) to "audit" the costs incurred and revenues obtained by the directed carrier and to certify to the Secretary of the Treasury the amount of payment due the carrier. We interpret these grants of authority to require the ICC to do more than merely check to see that the particular amounts recorded actually were expended or received by the carrier. Rather, in our view, it has a duty to determine that the amounts expended by the directed carrier were the type of expenditures for which Congress intended the carrier to receive reimbursement.

Even more importantly, we note that the preamble to the Rail Act declares Congress's intention to provide for "necessary Federal financial assistance [for essential rail service] at the lowest possible cost to the general taxpayer." 45 U.S.C. § 701(b)(6) (Supp.IV, 1974). This court has recently stated that "[w]e read this language as an earnest entreaty to economize, addressed to those who are authorized to spend many millions, ultimately billions, of dollars in preserving and subsidizing essential rail service." *In re Penn Central Transportation Co.*, 533 F.2d 1347 at 1352 (3d Cir. 1976).[26] This "express" Congressional policy would be undermined if the ICC was required to reimburse a directed carrier for every expenditure made in connection with directed service, regardless of its reasonableness. We agree with the Commission that "[i]t would be entirely unacceptable for all claimed costs, subject only to technical audit, to be paid without evaluation of their propriety."

■ L&NE argues that a preamble cannot confer powers on the Commission that are not conferred by the operative language of the statute.[27] But we have not concluded that the preamble to the Rail Act confers powers on the ICC not granted it in the operative language of the statute. Rather, we have merely used the preamble as a guide to aid us in determining the legitimate scope of the administrative authority that is clearly reposed in the Commission by the operative language of section 1(16)(b). In analogous situations, the Supreme Court has relied on the National Transportation Policy set forth in the preamble to the Interstate Commerce Act to determine the extent of authority granted the Commission in specific sections of that Act. *See, e. g.,*

**26.** We recognize that the directed service provision of the Rail Act was enacted as an amendment to the Interstate Commerce Act and that it has force and effect outside the context of the regional rail reorganization contemplated by the Rail Act. *See* note 3 *supra* and accompanying text. Nevertheless, we do not feel that the scope of administrative authority granted the Commission under section 1(16)(b) can be measured without consideration of the purposes for which this section was originally enacted—namely, to preserve essential rail service in the short-run, pending longer term regional rail reorganization. *Id.; see Permian Basin Area Rate Cases,* 390 U.S. 747, 776, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968); *United States v. Pennsylvania R. R.,* 323 U.S. 612, 618–19, 65 S.Ct. 471, 89 L.Ed. 499 (1945).

**27.** *See, e. g., Carter v. Carter Coal Co.,* 298 U.S. 238, 289–90, 56 S.Ct. 855, 80 L.Ed. 1160 (1936); *Yazoo & Mississippi Valley R. R. v. Thomas,* 132 U.S. 174, 188, 10 S.Ct. 168, 33 L.Ed. 302 (1889); *Hughes Tool Co. v. Meier,* 486 F.2d 593, 596 (10th Cir. 1973).

*American Trucking Associations, Inc. v. Atchison, Topeka & Sante Fe Ry.*, 387 U.S. 397, 409–10, 87 S.Ct. 1608, 18 L.Ed.2d 847 (1967); *United States v. Pennsylvania R. R.*, 323 U.S. 612, 618–19, 65 S.Ct. 471, 89 L.Ed. 499 (1945).

Finally, the Interstate Commerce Act and the Rail Act entrust a broad subject matter to administration by the ICC. Surely, the scope of the Commission's responsibilities under the Act requires a generous construction of its statutory authority. In deciding a question concerning the scope of Commission authority in a different context, a three-judge court in *Florida East Coast Ry. v. United States*, 259 F.Supp. 993, 997 (M.D. Fla.1966), *aff'd* 386 U.S. 544, 87 S.Ct. 1299, 18 L.Ed.2d 285 (1967) stated:

> No one who reviews the history and language of the Interstate Commerce Acts can doubt that Congress has entrusted the ICC with plenary power to regulate almost every aspect of the rail industry . . . . The ICC is in many ways a super-management often making managerial-type decisions affecting the transportation industry, with but one overriding duty—to protect the public interest.

We think these observations particularly applicable to the ICC's broad emergency power to order and regulate directed service under section 1(16)(b). *See also* 49 U.S.C. §§ 1(14)–(15).

Having concluded that the Commission has authority to determine what costs are reimbursable consistent with section 1(16)(b), does not, of course, mean that the exercise of that power here was proper. In section 1(16)(b)(E), Congress intended that the directed carrier be reimbursed for all reasonable expenses necessary to providing directed service. Thus, the Commission's rules denying reimbursement to the directed carrier for rent paid to the other carrier in the event of an unprofitable operation can only be upheld as a reasonable exercise of its authority if, as both a statutory and a constitutional matter, the directed carrier is not required to pay rent to the other carrier in that instance.

## C. ICC's Construction of Section 1(16)(b)

While not specifically argued by L&NE, we must first determine whether the ICC's cost reimbursement regulations denying rent to the other carrier where the cost of directed operations exceeds revenue comport with Congress's intent in enacting section 1(16)(b). *See Hagans v. Lavine*, 415 U.S. 528, 543, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974); *Allen v. Aytch*, 535 F.2d 817 at 819 (3d Cir. Apr. 29, 1976). In deciding this question we are mindful of the Supreme Court's statement in *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965):

> When faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration. "To sustain the Commission's application of this statutory term, we need not find that its construction is the only reasonable one, or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings." *Unemployment Comm'n v. Aragon*, 329 U.S. 143, 153 [67 S.Ct. 245, 250, 91 L.Ed. 136]. *See also, e. g., Gray v. Powell*, 314 U.S. 402 [62 S.Ct. 326, 86 L.Ed. 301]; *Universal Battery Co. v. United States*, 281 U.S. 580, 583 [50 S.Ct. 422, 74 L.Ed. 1051]. "Particularly is this respect due when the administrative practice at stake 'involves a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion; of making the parts work efficiently and smoothly while they are yet untried and new.'" *Power Reactor Co. v. Electricians*, 367 U.S. 396, 408 [81 S.Ct. 1529, 1535, 6 L.Ed.2d 924].

*See also Lucas Coal Co. v. Interior Board of Mine Operations Appeals*, 522 F.2d 581, 584 (3d Cir. 1975).

The statutory language of section 1(16)(b)(E) does not specifically provide for the payment of any monies to the other carrier; rather, it requires a payment solely to the directed carrier of the costs incurred

in performing the directed service. "Cost" is defined as follows:

The term "cost" shall mean those expenditures made or incurred in or attributable to the operations as directed, including the rental or lease of necessary equipment, plus an appropriate allocation of common expenses, overheads, and a reasonable profit.

Thus, the ICC concluded that if rent for use of the other carrier's properties were to qualify as a "cost," it must result from the inference that such rent is an expenditure to be "incurred" by the directed carrier. The Commission rejected such an inference based on its views that it was highly unlikely that Congress intended to provide a monetary incentive to the other carrier to abandon rail service without prior ICC approval,[28] and that the other carrier would derive substantial benefits from directed service so as to render compensation in the form of rent unnecessary as a matter of law in the case where costs exceeded revenues.[29]

The ICC has given careful consideration to this question. We cannot say that its interpretation of section 1(16)(b) is unreasonable so long as the interpretation does not contravene the fifth amendment— the L&NE contention—for a statute should be construed to be constitutional where possible.[30]

## D. Directed Service and the Fifth Amendment

Essential to L&NE's argument that the ICC's denial of rent, in the usual case, to the other carrier deprives the other carrier of just compensation as required by the fifth amendment, is the assumption that directed service constitutes a taking within the meaning of that constitutional provision. We decline to accept that assumption. The line between a taking of property for

28. The Commission's reasoning was stated in its Report as follows:

Under the Interstate Commerce Act, all common carriers by railroad must fulfill their common carrier obligation to continue service to the public (Section 1(4)), unless and until a certificate of abandonment is authorized by the Commission pursuant to the provisions of section 1(18) of the Act. Under the requirements of section 1(16)(b), in order for the Commission to issue a directed service order, the operated carrier, having ceased operations without obtaining a certificate of abandonment from the Commission, must be in dereliction of its statutory duty to continue to provide such service. Smith v. Hoboken R. Co., 328 U.S. 123, 130, 66 S.Ct. 947, 90 L.Ed. 1123 (1946). It is highly unlikely that Congress in its consideration of section 1(16)(b) desired to provide a monetary incentive for the unlawful abandonment of rail service. Rewarding a railroad for avoiding such a legal obligation would be contrary to public policy.

ICC Report, supra note 7, Joint App. at A–172.

29. The Report continued:

Whatever consideration is given to the economic loss of the operated carrier because of the ordering of directed service over its properties must be balanced by a consideration of the benefits conferred by such an order. First, the carrier avoids incurring any additional operating losses which might impair the interests of its creditors or further erode its invested capital. Further, during the period of the directed service, the property will be maintained in order to continue service and all employee obligations for those employees hired by the directed carrier will be satisfied. Consequently, in ordering directed service, the Commission both fulfills the carrier's legal obligation to continue to provide service and preserves the value that the operated properties might have for continued use in their dedicated purpose.

Id. at A–173.

Additionally, since the authority to abandon the rail properties has not yet been approved, the carrier cannot legally convert the capital it has invested in the property to a non-rail use. Until such an abandonment is approved, these assets would be unutilized and thus be subject to deterioration since the carrier has no funds available either to continue operations or maintain its properties. The defaulting carrier, in most foreseeable situations, would not then have any return on the value of its invested capital. Consequently any economic loss to the defaulting carrier, from a direction of service over these lines and facilities, would be minimal.

Id. at A–172 to –173.

30. See, e. g., Regional Rail Reorganization Act Cases, 419 U.S. 102, 134, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974); United States Civil Serv. Comm'n v. National Ass'n of Letter Carriers, 413 U.S. 548, 571, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973).

which just compensation must be provided and a legitimate exercise of regulatory authority by the government, which may result in a loss but which does not require compensation, is a thin one, indeed.[31] And we recognize that on which side of this line directed service falls may be a close and difficult question. Nevertheless, we are satisfied from a review of the obligations imposed on a railroad to continue service until receiving Commission approval to abandon, even when continuation results in not unreasonable losses, and from an examination of the effects on the other carrier of directed operations that directed service, when unprofitable and as currently implemented by the ICC, does not constitute a taking for which compensation in the form of rental to the other carrier for the use of its lines must be provided.[32]

Fundamental to our holding are two conclusions: (1) that the ICC has the power to order a carrier that has not obtained a certificate of abandonment under 49 U.S.C. § 1(18)[33] to continue to provide service for as much as 240 days, the maximum period of directed service, despite a cash deficiency or operating losses[34] or, indeed, a court order to the contrary;[35] and (2) that such action by the Commission would not constitute a taking for which compensation must be provided, but rather would be merely a postponement of the carrier's right to abandon.[36] If the ICC could take the above recited action without such action constituting a taking, we think it follows directly that it could place another carrier on the lines of the carrier unable or unwilling to continue service for a limited period without effecting a taking within the meaning of the fifth amendment.

■ In a line of cases in the 1920's, the Supreme Court did hold that if a railroad "be taken to have granted to the public an interest in the use of the railroad it may withdraw its grant by discontinuing the use when that use can be kept up only at a loss." *Brooks-Scanlon Co. v. Railroad Comm'n,* 251 U.S. 396, 399, 40 S.Ct. 183, 184, 64 L.Ed. 323 (1920); *see Railroad Comm'n v. Eastern Texas R. R.,* 264 U.S. 79, 85, 44 S.Ct. 247, 68 L.Ed. 569 (1924); *Bullock v. Florida ex rel. Railroad Comm'n,* 254 U.S. 513, 520–21, 41 S.Ct. 193, 65 L.Ed. 380 (1921). While these decisions have never been repudiated by the Supreme Court, and this court does not dispute their fundamental principles, the rights of the owners of

---

**31.** We note that both courts and leading commentators have encountered difficult conceptual problems in attempting to develop a comprehensive approach to defining the legitimate scope of the takings clause and, in particular, in differentiating between "takings" and "mere regulation." *See, e. g.,* Sax, *Takings, Private Property and Public Rights,* 81 Yale L.J. 149 (1971); Michelman, *Property, Utility, and Fairness: Comments on the Ethical Foundations of "Just Compensation" Law,* 80 Harv.L.Rev. 1165 (1967); Sax, *Takings and the Police Power,* 74 Yale L.J. 36 (1964); Dunham, *Griggs v. Allegheny County in Perspective: Thirty Years of Supreme Court Expropriation Law,* 1962 Sup.Ct.Rev. 63.

**32.** Because of our conclusion we need not and do not reach the questions whether the benefits conferred on the other carrier as a result of directed service as a matter of law obviate the necessity to provide rent to the other carrier and whether the ICC in promulgating its cost reimbursement regulations has usurped the judicial function of determining what constitutes just compensation.

**33.** Section 1(18) provides, in pertinent part:

[N]o carrier by railroad subject to this chapter shall abandon all or any portion of a line of railroad, or the operation thereof, unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity permit of such abandonment.

49 U.S.C. § 1(18) (1970).

**34.** *See New Haven Inclusion Cases,* 399 U.S. 392, 461, 491–92, 90 S.Ct. 2054, 26 L.Ed.2d 691 (1970); *In re Penn Central Transportation Co.,* 384 F.Supp. 895, 919 (Regional Rail Reorganization Act Special Court 1974).

**35.** *See In re Erie Lackawanna Ry.,* 517 F.2d 893, 896–98 (6th Cir. 1975); *In re Central R. R. of New Jersey,* 485 F.2d 208, 211–12 (3d Cir. 1973) (en banc), *cert. denied,* 414 U.S. 1131, 94 S.Ct. 870, 38 L.Ed.2d 755 (1974).

**36.** *See New Haven Inclusion Cases,* 399 U.S. 392, 490–93, 90 S.Ct. 2054, 26 L.Ed.2d 691 (1970); *Continental Illinois Nat'l Bank & Trust Co. v. Chicago, Rock Island & Pacific Ry.,* 294 U.S. 648, 680–81, 55 S.Ct. 595, 79 L.Ed. 1110 (1935).

railroads have never been considered absolute; they are qualified by consideration of the public's interest in continued essential rail service.[37] Thus, a railroad may not abandon service without prior Commission approval, *New Haven Inclusion Cases*, 399 U.S. 392, 461, 90 S.Ct. 2054, 26 L.Ed.2d 691 (1970); *In re Central R. R. of New Jersey*, 485 F.2d 208, 214 (3d Cir. 1973) (en banc), *cert. denied*, 414 U.S. 1131, 94 S.Ct. 870, 38 L.Ed.2d 755 (1974), because prior "administrative review assures that an agency with substantial expertise . . . will provide that the appropriate amalgam of public concerns for rail transport and private rights of property is achieved." *Id.* at 215. Second, a railroad or its estate may be made to suffer interim reasonable losses, without compensation, for a reasonable period of time during which solutions accommodating the public and private interests can be devised—that is, the exercise of the rights and remedies of the owners of the carrier or its estate may be postponed for a reasonable length of time without effecting a taking.[38] *New Haven Inclusion Cases, supra* at 493, 90 S.Ct. 2054; *In re Penn Central Transportation Co.*, 384 F.Supp. 895, 919 (Regional Rail Reorganization Special Court 1974); *see RFC v. Denver & Rio Grande Western R. R.*, 328 U.S. 495, 535–36, 66 S.Ct. 1282, 90 L.Ed. 1400 (1946); *Continental Illinois Nat'l Bank & Trust Co. v. Chicago, Rock Island & Pacific Ry.*, 294 U.S. 648, 677, 55 S.Ct. 595, 79 L.Ed. 1110 (1935).

The Supreme Court's decision in the *New Haven Inclusion Cases* is instructive in this respect.[39] While awaiting implementation of a plan of reorganization and inclusion in the Penn Central system, the New York, New Haven & Hartford Railroad had been required to continue to provide rail service and as a result to incur "substantial losses."[40] In holding that the forced deficit operation did not constitute a taking for which compensation was required, the Court stated, 399 U.S. at 491–92, 90 S.Ct. at 2109:

> a railroad not in reorganization may have more of an obligation to the public. *Cf. Myers v. Jay Street Connecting R. R.*, 259 F.2d 532, 536 (2d Cir. 1958).

**37.** That the owners of railroads must make sacrifices in the public interest was recognized by the Supreme Court at the same time as it was deciding the *Brooks-Scanlon* line of cases. *See The New England Divisions Case*, 261 U.S. 184, 190–92, 43 S.Ct. 270, 67 L.Ed. 605 (1923); *Dayton-Goose Creek Ry. v. United States*, 263 U.S. 456, 479–83, 44 S.Ct. 169, 68 L.Ed. 388 (1924). A more recent and forceful statement by the Court that the railroad owners must consider the public interest as well as their balance sheets is found in the *Penn-Central Merger and Norfolk & Western Inclusion Cases*, 389 U.S. 486, 510–11, 88 S.Ct. 602, 611, 19 L.Ed.2d 723 (1968):

> While the rights of the bondholders are entitled to respect, they do not command Procrustean measures. They certainly do not dictate that rail operations vital to the Nation be jettisoned despite the availability of a feasible alternative. The public interest is not merely a pawn to be sacrificed for the strategic purposes or protection of a class of security holders whose interest may or may not be served by the destructive move.

While the *Penn-Central Merger Cases* and other cases discussed *infra* generally concern railroads in reorganization, which L&NE is not, we do not consider this fact to require a different approach here. Both the bankruptcy power and the commerce power are equally subject to the fifth amendment. *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 589 & n. 19, 55 S.Ct. 854, 79 L.Ed. 1593 (1935). Indeed,

**38.** We emphasize that we are only speaking to the situation where the carrier is forced to incur losses for a reasonable limited period of time such as is involved with directed service, the maximum period of which is limited to 240 days. We do not address the question whether a carrier or its estate may be forced to bear large losses, without compensation, for an unlimited period of time where solutions are not likely to be forthcoming. *See In re Penn-Central Transportation Co.*, 384 F.Supp. 895, 919 (Regional Rail Reorganization Special Court (1974)).

**39.** *See generally* Note, *Conrail and Liquidation Value: Creditors' and Stockholders' Entitlement in the Regional Rail Reorganization*, 85 Yale L.J. 371 (1976); Note, *Takings and the Public Interest in Railroad Reorganization*, 82 Yale L.J. 1004 (1973).

**40.** The reorganization court had stated " 'the losses reasonably incident to working out the solution most consistent with the public interest' [have] eroded the debtor's estate in excess of $60 million." *In re New York, New Haven & Hartford R. R.*, 304 F.Supp. 793, 800 (D.Conn. 1969), *modified*, 399 U.S. 392, 90 S.Ct. 2054, 26 L.Ed.2d 691 (1970).

The rights of the bondholders are not absolute. As we have had occasion to say before, security holders

> "cannot be called upon to sacrifice their property so that a depression-proof railroad system might be created. But they invested their capital in a public utility that does owe an obligation to the public. . . . [B]y their entry into a railroad enterprise, [they] assumed the risk that in any depression or any reorganization the interests of the public would be considered as well as theirs." *Reconstruction Finance Corp. v. Denver & R. G. W. R. Co.*, 328 U S. 495, 535–536, 66 S.Ct. 1282, 90 L.Ed. 1400.

In our view, the *New Haven Inclusion Cases* dictate a holding that directed service does not constitute a taking, at least in the factual circumstances presented here. Unlike *New Haven*, where the railroad was required to continue to operate for a period of six years, directed service can last only 240 days. More importantly, whereas in *New Haven* the carrier was forced to incur "substantial" operating losses, the other carrier during a directed operation sustains no operating losses because the directed carrier transports the other carrier's traffic for it. Such was the case with L&NE which, as a result of the directed service, was spared losses it might otherwise have been legally required to incur. Finally, the other carrier's properties are maintained and in some cases upgraded during the directed operation.[41] These factors convince us that rather than suffering a diminution of their collateral, the most that the owners of a carrier suffer as a result of directed service is a postponement of their remedy of abandonment, for which no compensation is necessary. *See Continental Illinois Bank & Trust Co. v. Chicago, Rock Island & Pacific Ry., supra*, 294 U.S. at 677, 55 S.Ct. 595.

L&NE counters that all of the above cases are distinguished because they dealt with "erosion takings"—where the railroad's estate is eroded by deficit operations—and not with "conveyance takings" —where the physical properties of the carrier are taken. Directed service, it contends, involves a conveyance taking. The Supreme Court did recognize the distinction between an erosion taking and a conveyance taking in the *Regional Rail Reorganization Act Case*, 419 U.S. 102, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974).[42] Also, in deciding the question whether a fifth amendment taking has occurred, many courts seem to have considered as determinative the physical occupation by the government of property belonging to the claimant.[43]

While we do not discount the importance of this factor, we eschew such a formalistic approach to the takings question. Although as a conceptual matter, ordering a carrier to continue operations for 240 days may differ from placing another carrier on those lines for 240 days, we do not think this possible difference dictates a holding here that the latter constitutes a taking but the former does not. It might be anomalous indeed if the ICC could order forced deficit operations by a railroad and not effect a taking, but could not order another carrier to discharge those same duties, thereby in the usual case saving that railroad operating costs, without such action constituting a taking. The ICC does not take title to the other carrier's property during directed service. The other carrier's rights to sell or dispose of its property for non-railroad use are no more qualified during directed serv-

---

**41.** The Commission in its cost reimbursement regulations provides for maintenance of way expenses and expenses necessary to bring the other carrier's lines into compliance with the Federal Rail Safety Act of 1970. ICC Report, note 7, *supra*, Joint App. at A–175, –188; 49 C.F.R. § 1126. For the specific expenditures made on L&NE's behalf see note 18 *supra* and accompanying text.

**42.** *See also In re Penn Central Transportation Co.*, 384 F.Supp. 895 (Regional Rail Reorganization Act Special Court 1974).

**43.** *See generally* Michelman, *Property, Utility and Fairness: Comments on the Ethical Foundations of "Just Compensation" Law*, 80 Harv. L.Rev. 1165, 1184–90 (1967).

ice than they are normally since prior ICC approval is required in either case.[44]

### E. *Reimbursement for Rent During a Profitable Operation*

 L&NE's final contentions regarding the Commission's cost reimbursement regulations are that the distinction between profitable and unprofitable directed operations for the purpose of determining whether rent should be paid the other carrier is arbitrary and capricious and that the method of calculating the rent in the event of a profitable operation is also arbitrary and capricious. Neither contention convinces us to set aside the ICC's regulations.

We decline to resolve L&NE's challenge to the method of determining rent in the event of profitable directed operations at this time because directed service under Service Orders 1207 and 1208 was not profitable, L&NE did not raise this contention before the ICC and the ICC is currently considering this issue as a result of a petition by the Rock Island Railroad. As to L&NE's argument concerning the distinction between profitable and unprofitable operations,[45] the ICC made this distinction because it was concerned that the benefits normally received by the other carrier as a result of directed service might not be sufficient where the operation was profitable.[46] We do not consider that decision to be arbitrary or capricious or without rational basis.

### IV.

Accordingly, the petition of L&NE to review and set aside the Commission's cost reimbursement regulations insofar as they do not provide, except for profitable operations, for the payment of rent to the other carrier will be denied.

---

**44.** It should be noted here that L&NE did not even seek ICC approval to abandon until nearly 9 months after it had issued its embargo.

**45.** The Commission asserted that L&NE had no standing to challenge the differential treatment accorded profitable and unprofitable operations because operations under Service Orders 1207 and 1208 did not result in a profit. Brief for Respondent at 46. However, L&NE is clearly

aggrieved by the application of this distinctive treatment and thus in our view has standing to challenge this distinction. *See generally Association of Data Processing Serv. Organizations, Inc. v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970)

