**William M. GIBBONS, as Trustee of the Chicago, Rock Island and Pacific Railroad Company, Debtor, Continental Illinois National Bank and Trust Company of Chicago, as Indenture Trustee, The First National Bank of Chicago, as Indenture Trustee, and Henry Crown, et al., Petitioners,**

v.

**UNITED STATES of America and Interstate Commerce Commission, Respondents.**

St. Louis-San Francisco Railway Company and The Regional Transportation Authority, Intervening-Respondents.

**ST. LOUIS SOUTHWESTERN RAIL-WAY COMPANY, Petitioner,**

v.

**UNITED STATES of America and Interstate Commerce Commission, Respondents.**

Nos. 80–1786, 80–1858.

United States Court of Appeals, Seventh Circuit.

Argued June 2, 1981.

Decided Aug. 26, 1981.

As Amended Nov. 9, 1981.

---

Charles G. Cole, Steptoe & Johnson, Washington, D. C., Daniel R. Murray, Jenner & Block, Chicago, Ill., for petitioners.

John J. McCarthy, Jr., I.C.C., Washington, D. C., Jeremiah Marsh, Chicago, Ill., for respondents.

Before BAUER and WOOD, Circuit Judges, and GRANT,* Senior District Judge.

BAUER, Circuit Judge.

We consider two issues in these consolidated appeals: first, the power of the Interstate Commerce Commission to set compensation for the temporary, "permissive" use of lines of the Chicago, Rock Island and Pacific Railroad Company ("Rock Island"); second, the propriety of the compensation granted to the Rock Island in three service orders. We affirm the orders of the Interstate Commerce Commission.

I

The Interstate Commerce Commission ("ICC") authorized three carriers—the St. Louis-San Francisco Railway Company ("Frisco"), the Regional Transportation Authority ("RTA"), and the St. Louis Southwestern Railway Company ("SSW")—to conduct rail operations temporarily over certain Rock Island lines.[1]

Service Order No. 1451, issued by the ICC on March 19, 1980, and revised on April 15, 1980, authorized Frisco to operate at eight former Rock Island locations over short segments of track with high traffic density. The ICC asserted authority to issue Service Order No. 1451 under 49 U.S.C. § 11123(a)(3).[2]

---

* The Honorable Robert A. Grant, Senior Judge of the United States District Court for the Northern District of Indiana, is sitting by designation.

1. Service Order No. 1451, 45 F.R. 20883 (March 19, 1980); Revised Service Order No. 1451, 45 F.R. 25401 (April 15, 1980).

2. 49 U.S.C. § 11123(a)(3) provides:

Directed Service Order 1437 was issued by the ICC on March 20, 1980, pursuant to the directed service statute, 49 U.S.C. § 11125. It granted the RTA or its agent authority to provide service as a directed rail carrier over the Rock Island's Chicago-Joliet, Illinois commuter line, a distance of 40.6 miles.[3]

Directed Service Order No. 1453[4] was issued by the ICC on March 21, 1980, also pursuant to 49 U.S.C. § 11125. This Order granted SSW temporary authority to operate the Rock Island's Tucumcari line between Santa Rosa, New Mexico, and St. Louis, Missouri, a distance of 965.2 miles.

Directed Service Order No. 1456,[5] issued by the ICC on March 25, 1980, pursuant to 49 U.S.C. § 11125, granted the SSW temporary authority to operate over the Rock Island line between Memphis, Tennessee and Fordyce, Louisiana, and certain branch lines.

Each of the orders were termed "permissive", that is, the ICC gave each carrier permission to use the lines, but did not require them to do so. Each of the orders provided for directed service from late March to May 31, 1980, the maximum allowable time for directed service under 49 U.S.C. § 11125. Each of the orders expressly conditioned permission to use the lines on a waiver of federal subsidization under 49 U.S.C. § 11125(b)(5), since the Congressional appropriations under that subsection had run out.

Each service order was conditioned also on the payment of compensation by the carriers to the Rock Island. The directed service orders contained the following provision:

> [SSW or RTA] and the RI Trustee shall negotiate regarding terms of compensation regarding use of the line and related facilities. In the event of a failure to reach agreement, we [the ICC] reserve the right to set reasonable compensation terms.

Directed Service Order Nos. 1453 at 8; 1456 at 7. Supp. Order No. 1, Directed Service Order No. 1437 (March 25, 1980) at 1. Similar language was contained in Service Order No. 1451 (Frisco).

The several rail carriers and the Trustee entered into negotiations as anticipated by the compensation condition in each order. Negotiations immediately broke down. On April 3, 1980, SSW filed a "Petition for Determining and Fixing, or Denying Compensation" seeking the exercise of the Commission's reserved "right to set terms of reasonable compensation." When negotiations with Frisco broke down, Frisco filed a petition seeking Commission arbitration. The negotiations with the RTA also reached an impasse. In that case, the Trustee himself requested the Commission to set the terms of compensation.

The ICC issued three Compensation decisions in response to the various petitions. In its decision setting compensation for Frisco's use of Rock Island property, the Commission established a compensation for-

---

(a) When the Interstate Commerce Commission considers that a shortage of equipment, congestion of traffic, or other emergency requiring immediate action exists in a section of the United States, the Commission may—

     *    *    *    *    *    *

(3) require joint or common use of terminals, including mainline tracks for a reasonable distance outside of those terminals, on terms of compensation the carriers establish between themselves, subject to subsection (b)(2) of this section, when that action will best meet the emergency and serve the public interest.

**3.** Directed Service Order No. 1437, 45 F.R. 21641 (April 2, 1980).

**4.** 45 F.R. 21643 (April 2, 1980).

**5.** 45 F.R. 21639 (April 4, 1980). The ICC had previously authorized the SSW to operate over the Tucumcari line in Service Order No. 1411 and over the Memphis-Fordyce line in Service Order No. 1415. However, these orders were issued pursuant to 49 U.S.C. § 11123. This court's decision in *Atchison, Topeka & Santa Fe Ry. Co. v. United States*, 617 F.2d 485 (7th Cir. 1980), vacated those orders. The ICC reauthorized the same service pursuant to 49 U.S.C. § 11125 in Directed Service Order Nos. 1453 and 1456.

mula which was applied to all the other lines involved here, except the Tucumcari. Finance Docket No. 29305, 363 I.C.C. 248 (1980) ("Frisco Compensation Order"). *See* Supp. Order No. 2, Directed Service Order No. 1437 (May 9, 1980) (RTA); Supp. Order No. 2, Directed Service Order Nos. 1453 and 1456 (April 28, 1980) (Memphis-Fordyce line). The *Frisco* order provided for a base rental of $1250 per route mile per year, plus 14.4 per cent of any profits generated by the line. The Commission ordered rent for the Tucumcari line based on a percentage rate of return on the agreed sale price of the line between the Rock Island and SSW, less expenditures which preserved the value of the property (up to fifty percent of rent payment).

The Commission affirmed its decision in September 1980, concluding that the formulas made a reasonable accommodation of the opposing interests of the parties. *Fris-co Compensation Decision on Reconsideration*, Finance Docket No. 29305, 363 I.C.C. 264, 269 (1980) and *Decision on Reconsideration*, Supp. Order No. 2 to Directed Service Orders Nos. 1453 and 1456, 363 I.C.C. 252, 263 (1980).

In No. 80–1858, SSW petitions for review of the Tucumcari and Memphis-Fordyce compensation order and the ICC's decision on reconsideration. In No. 80–1786, the Trustee of the Rock Island and other parties [6] petition for review of all three compensation orders. RTA and Frisco intervene on behalf of the Commission in No. 80–1786.

## II

The scope of the issues before us should be clarified at the outset. None of the parties contest the Commission's authority to order temporary directed service under section 11123(a)(3) or section 11125 [7] of the

---

**6.** The petitioners in No. 80–1786 are William M. Gibbons, Trustee of the Chicago, Rock Island and Pacific Railroad Company ("Rock Island"); Continental Illinois National Bank and Trust Company of Chicago, as Trustee under the Income Debenture Indenture; the First National Bank of Chicago, as Trustee under the First Mortgage Indenture; and Henry Crown *et al.*, substantial holders of income debentures, first mortgage bonds and common stock of the Rock Island.

**7.** 49 U.S.C. § 11125 provides:

(a) When a rail carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission under subchapter I of chapter 105 of this title cannot transport the traffic offered to it because—

(1) its cash position makes its continuing operation impossible;

(2) transportation has been discontinued under court order; or

(3) it has discontinued transportation without obtaining a required certificate under section 10903 of this title;

the Commission may direct the handling, routing, and movement of the traffic available to that carrier and its distribution over the railroad lines of that carrier by another carrier to promote service in the interest of the public and of commerce. Subject to subsection (b) of this section, the Commission may act without regard to subchapter II of chapter 103 of this title and subchapter II of chapter 5 of title 5.

(b)(1) Action of the Commission under subsection (a) of this section may not remain in effect for more than 60 days. However, the Commission may extend that period for an additional designated period of not more than 180 days if cause exists.

(2) The Commission may not take action that would—

(A) cause a directed carrier to operate in violation of section 421 of title 45; or

(B) impair substantially the ability of a directed carrier to serve its own patrons adequately, or to meet its outstanding common carrier obligations.

(3) A directed carrier is not responsible, because of the direction of the Commission, for the debts of the other carrier.

(4) A directed carrier shall hire the employees of the other carrier, to the extent that they previously provided that transportation for the other carrier, and assume the existing employment obligations and practices of the other carrier for those employees including agreements governing rate of pay, rules and working conditions, and employee protective conditions from the period during which the action of the Commission is effective.

(5) A directed carrier may apply to the Commission for payment of an amount equal to the amount by which (A) the total expenses of that carrier incurred in or attributable to the handling, routing, and moving [of] the traffic over the lines of the other carrier for the period during which the action of the Commission is effective, including renting or leasing necessary equipment and an allocation of common expenses, overhead, and a reasonable profit, exceed (B) the direct reve-

Interstate Commerce Act. Further, none of the parties contest the Commission's authority to condition the grant of a temporary directed service order (DSO) on a waiver of the federal subsidy provided by section 11125(b)(5)[8]—although the power to require waiver of the subsidy is not expressly given by the Act. Rather, the two petitioners contest the Commission's authority to also condition the grant of a DSO on the payment of rent to the Rock Island.

Although congruent in their goals, the two petitioners differ in their motives. The Trustee wants compensation to be determined in the Reorganization Court, where he hopes to get more money. Thus he argues that the use of its lines here constitutes a "taking" requiring a *judicial* determination of "just compensation." SSW, on the other hand, wants to pay the Rock Island nothing. So it argues, disingenuously, that the ICC has the power to authorize one type of condition, but not the other.

We tire of arguments of expediency addressed to us under the guise of principle. Nevertheless, we have considered these contentions seriously. Both are without merit.

■ The ordering of directed service pursuant to section 11125 does not constitute a fifth amendment taking. *Lehigh & New England Rwy. Co. v. I.C.C.*, 540 F.2d 71, 82 (3d Cir. 1976), *cert. denied*, 429 U.S. 1061, 97 S.Ct. 784, 50 L.Ed.2d 776 (1977). Since a railroad's property is charged with the public interest, *New England Divisions Case*, 261 U.S. 184, 190, 43 S.Ct. 270, 273, 67 L.Ed. 605 (1923), no taking of private property for public use occurs when a directed carrier performs the public service obligations of the defaulting carrier. 540 F.2d at 82.

Rock Island contends that *Lehigh* does not apply to it because it has been declared "cashless." Our decision in *In re Chicago, Milwaukee, St. Paul & Pacific R.R. Co.*, 611

F.2d 662, 669 (7th Cir. 1979), held that a cashless railroad "cannot be required to continue operating to serve the public interest." The Rock Island argues that *Milwaukee* means that its public service obligations have ended and that therefore any use of its property for a public purpose constitutes a taking. We disagree.

Our decision in *Milwaukee* held only that the ICC could not force the Rock Island *itself* to continue operating. But even if the Rock Island cannot operate, it must still fulfill its obligations under the Interstate Commerce Act. 49 U.S.C. § 11101; *see Akron, Canton & Youngstown R.R. Co. v. I.C.C.*, 611 F.2d 1162, 1168 (6th Cir. 1979), *cert. denied*, 449 U.S. 830, 101 S.Ct. 97, 66 L.Ed.2d 24 (1980). Those obligations end only with the grant of a certificate of abandonment. 49 U.S.C. § 10903; *New Haven Inclusion Cases*, 399 U.S. 392, 461, 90 S.Ct. 2054, 2093, 26 L.Ed.2d 691 (1970); *Lehigh*, 540 F.2d at 83. Would a finding of "cashlessness" suffice, the need for a certificate of abandonment would be eliminated in many cases. Such a result would contravene the express Congressional directive that only the Interstate Commerce Commission determine whether "the present or future public convenience and necessity require or [should] permit the abandonment or discontinuance" of rail service. 49 U.S.C. § 10903. Therefore, until a certificate of abandonment is issued, a rail carrier who is authorized to operate over the Rock Island's lines is fulfilling the Rock Island's obligations.

■ We agree with the *Lehigh* court that no taking has occurred. *Lehigh*, 540 F.2d at 84. Accordingly, compensation for the use of its lines need not be set in a judicial proceeding or be equal to "just compensation" under the Constitution.

---

nues from handling, routing, and moving that traffic over the lines of the other carrier during that period. The carrier must submit a current record of those total expenses to the Commission. The Commission shall certify promptly, to the Secretary of the Treasury, the amount to be paid. The Secretary shall pay that amount by the 90th day after the end of the period during which the direction of the Commission is effective, and funds are authorized to be appropriated for that payment. The Commission may audit any such record.

**8.** *See* n.7, *supra*.

## B

■ Until March 23, 1980, when federal subsidies ran out, the ICC directed federally subsidized service on the Rock Island system under section 11125. Directed Service Order No. 1398 (Sept. 26, 1979, I.C.C.) and Supp. Orders Nos. 1 and 2. Effective May 30, 1980, the Commission was granted express authority to direct unsubsidized service with compensation over the Rock Island system. ROCK ISLAND TRANSITION AND EMPLOYEE ASSISTANCE ACT ("RITA"), 45 U.S.C. §§ 1015, 1017. Indeed, the ICC has directed service under these sections with compensation over the lines involved here by the same carriers. Supp. Order No. 3, Directed Service Order No. 1437 (May 30, 1980) (RTA), Service Order No. 1473 (May 30, 1980) (SSW-Tucumcari line). The only question here is whether, for the two-month period from March 24, 1980 to May 30, 1980, the ICC could "fill the vacuum" by directing service with compensation over the Rock Island.

The answer is yes. "Congress has specifically declared that the Commission's authority is not limited by specific statutory enumerations in [49 U.S.C.] § 10321(a):

(a) The Interstate Commerce Commission shall carry out this subtitle. Enumeration of a power of the Commission in this subtitle does not exclude another power the Commission may have in carrying out this subtitle . . . .

The Supreme Court has explicitly recognized that administrative agencies must be given latitude beyond narrow statutory confines to effectuate their broad purposes: 'We are, in the absence of compelling evidence that such was Congress' intention, unwilling to prohibit administrative action imperative for the achievement of an agency's ultimate purposes.' *Permian Basin Area Rate Cases*, 390 U.S. 747, 780 [88 S.Ct. 1344, 1366, 20 L.Ed.2d 312] (1968)." [9]

Achievement of the Commission's purpose—preservation of a national transportation system and provision of transportation for the people and industries of the Midwest—was directly threatened in late March 1980. Because the Rock Island was cashless, the Commission could not order it to operate. *In re Chicago, Milwaukee, St. Paul and Pacific R.R. Co.*, 611 F.2d at 669. Further, federal subsidies under section 11125 were exhausted in late March. Without these subsidies, the ICC could not *force* another carrier to operate over the Rock Island. 49 U.S.C. § 11125. The ICC first attempted to solve the crisis by authorizing the same carriers to operate over the Rock Island, with compensation, under 49 U.S.C. § 11123(a)(2) and (a)(4). But that effort was halted when this Court ruled that the Commission could only authorize use of cars, but not lines, under sections 11123(a)(2) and (a)(4). *Atchison, Topeka & Santa Fe Rwy. v. United States*, 617 F.2d 485 (7th Cir. 1980). Further Congressional action was widely recognized to be forthcoming, but not in time. The ICC had no other express powers to deal with the crisis. The Rock Island would shut down.

The ICC then took a step to avoid the consequences of a shut down—it created "permissive" service orders under section 11125. The new orders were a hybrid of orders issued under sections 11125 and 11123. Like 11125 orders, they allowed service over entire lines. Since the Commission could not provide federal subsidies to the directed carrier, as contemplated by section 11125, the Commission made service voluntary, not mandatory. Like the earlier section 11123 orders, the new orders provided for compensation to the Rock Island for use of its lines.

The Commission's orders here were directly related to its express powers to direct service. We find the exercise of the ICC's power here "to be a legitimate, reasonable, and direct adjunct to the Commission's explicit statutory power." *United States v. Chesapeake & Ohio R.R. Co.*, 426 U.S. 500,

---

**9.** We quote from the "Application of St. Louis Southwestern Railway Company for Temporary Authority to Operate the Properties of the Chicago, Rock Island, and Pacific Railroad Sought to be Acquired by Purchase in Finance Docket No. 28799;" that is, SSW's application to operate the Tucumcari line. Hoisted with their own petard, we think (Hamlet, III, iv).

514, 96 S.Ct. 2318, 2325, 49 L.Ed.2d 14 (1976). *Compare, Atchison, Topeka & Santa Fe Rwy. Co. v. I.C.C.*, 607 F.2d 1199, 1203, (7th Cir. 1979) (statutory authority to publish "rates, fares, and charges" does not include power to publish operating schedules.[10]

SSW states *Chesapeake* dealt with the Commission's power to suspend rates. True enough, but nothing in the opinion suggests it applied only to that power. As held in the subsequently decided *Trans Alaska Pipeline Rates Cases*, 436 U.S. 631, 655–56, 98 S.Ct. 2053, 2066–67, 56 L.Ed.2d 591 (1978), the orders

allow[ed] the Commission in exercising its ... power, to pursue "a more measured course" and to "offe[r] an alternative tailored far more precisely to the particular circumstances" of these cases.

(*Quoting* 426 U.S. at 514, 96 S.Ct. at 2325.)

Nor could the ordering of compensation be considered contrary to law or arbitrary and capricious. 5 U.S.C. § 706. Since the carriers agreed to operate over the Rock Island voluntarily, the Commission rightly concluded that they expected to reap some benefits from the operation. The Commission required the carriers to pay compensation as a matter of equity. *SSW Commission Appeal*, 363 I.C.C. at 258.

Sections 120 and 122 of RITA indicate Congressional approval of the ICC's orders here. Both sections provide explicitly that the Rock Island is to be compensated for the voluntary use of its lines, and that the Commission should set reasonable terms of compensation if the parties are unable to

agree. 45 U.S.C. §§ 1015, 1017. The conference report on section 120 (relating to commuter service, 45 U.S.C. § 1015) stated:

The Conference substitute adopts the House provision with changes to indicate that ... the Rock Island is to receive such compensation as the Commission finds to be reasonable if the parties cannot reach agreement on compensation for the use of Rock Island properties and facilities. In determining compensation under this section *it is the conferees' desire that the Commission follow standards similar to those used in determining compensation to be paid to the trustee by interim operators in previous compensation determinations.*

H.R.Rep.No. 96–1041 at 33, 1980 U.S.Code Congressional and Administrative News 1194 (emphasis added).

Finally, the Staggers Rail Act of 1980 granted the Commission authority to order temporary service over the lines of any carrier *with* compensation under section 11123, thus overruling our *Atchison* decision.[11] P.L. 96–448, Title II, § 226, 94 Stat. 1930 (Oct. 14, 1980).

We affirm the Commission's exercise of its power to set compensation here.

### III

■ We now review the merits of the ICC's compensation orders. The Commission's actions under section 11125 are exempted from the rulemaking procedures of both the Administrative Procedure Act, 5 U.S.C. §§ 551–559, and the Interstate Com-

---

**10.** Setting compensation is not an unusual function of the ICC. Many sections of the Interstate Commerce Act grant the ICC authority to set "reasonable" compensation upon the failure of negotiations between carriers in similar circumstances. *E. g.*, 49 U.S.C. §§ 11103 (rail terminal use); 11123 (emergency use of car service, terminals); 11124 (rerouted traffic); 11127 (freight forwarders); and 45 U.S.C. § 562(g).

**11.** The Act substituted the term "facilities" for the phrase "terminals, including mainline tracks for a reasonable distance outside of those terminals." P.L. 96–448 § 226. The legislative history states:

[T]he Committee has amended 49 U.S.C. 11123 to clarify and reaffirm the power of the ICC to authorize appropriate actions in emergency situations to utilize the tracks and facilities of the disabled carrier. The Committee believes that the provisions will moot pending and potential litigation that will serve only to deter an expeditious restructuring of the Midwest. The Committee believes the authority in this section will permit the Commission the maximum powers at the least cost to the government.

H.R.Rep.No. 96–839, 96th Cong., 2d Sess. 23 (1980).

merce Act, 49 U.S.C. §§ 10321–10330; 49 U.S.C. § 11125(a); *see* n.5, *supra.* Accordingly, its orders are not governed by the "substantial evidence on the record" test. 5 U.S.C. § 706(2)(E). The Commission's orders must be upheld if they were not arbitrary, capricious, or an abuse of discretion. 5 U.S.C. § 706(2)(A); *Camp v. Pitts,* 411 U.S. 138, 140–41, 93 S.Ct. 1241, 1243, 36 L.Ed.2d 106 (1973); *Bowman Trans., Inc. v. Arkansas-Best Freight System,* 419 U.S. 281, 285–86, 95 S.Ct. 438, 441–42, 42 L.Ed.2d 447 (1974). In determining whether the Commission's actions were arbitrary or capricious, the court

> must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment; the court is not empowered to substitute its judgment for that of the agency.

*In re Penn Central Transportation Co.,* 440 F.Supp. 569, 575 (E.D.Pa.1977).

### A.

SSW objects that the Commission ignored its previous decisions in ordering compensation, citing the ICC's orders for subsidized service on the Rock Island lines under section 11125. *Implementation of Public Law 93–236, Section 601(e), Regional Rail Reorganization Act of 1973—Submission of Cost Data to Justify Reimbursement,* 348 I.C.C. 251 (1975) (hereinafter "*Cost Data*"); *Kansas City Terminal Railway Co.,* Directed Service Order No. 1398, 360 I.C.C. 389 (1979). It also cites one order for unsubsidized service. Directed Service Order No. 1462 (March 28, 1980) (hereinafter "*Multi-Carrier*").

In the *Cost Data* order, the Commission ruled that no compensation was due for mandatory subsidized service over a line where costs exceeded revenues. The Commission considered the costs and benefits of directed service to both the directed and the defaulting carrier. The benefits to the defaulting carrier included: fulfillment by another railroad of its common carrier obligations, avoidance of further operating losses, maintenance of its property, and satisfac-

tion of its employee obligations. In comparison, the burdens on the defaulting carrier were small. Because of its common carrier obligations, the defaulting carrier would be unable to convert its railroad property to any other use. Any loss from directed service would be minimal since the property would otherwise lie idle.

The benefits to the directed carrier, according to the ICC, were small. The Commission stated:

> Under a mandatory order, the directed carrier conducts operations not because of any perceived benefits, but because it is required to do so. Because these operations are not discretionary, we have no basis for concluding that a directed carrier will receive any benefit, other than profits from operations, if any, from performing the directed service.

*St. Louis Southwestern Railway Co.,* Supp. Order No. 2, Directed Service Order No. 1453, 363 I.C.C. 252, 256 (1980) (hereinafter "*SSW Commission Appeal*").

Finally, the payment of rent would provide revenue to the defaulting carrier which it would not have received if it had continued operating. The Commission reasoned that Congress could not have "desired to provide a monetary incentive for the unlawful abandonment of rail service. Rewarding a railroad for avoiding [its] legal obligation would be contrary to public policy." *Cost Data,* 348 I.C.C. at 265; *see Lehigh,* 540 F.2d at 81.

The benefits and burdens shifted, the Commission held, only if the directed carrier realized a profit in its operations. "Profitable directed operations clearly benefit, rather than burden, the carrier." *SSW Commission Appeal,* 363 I.C.C. at 256. The Commission concluded, nevertheless, that profitable operations should result in only "minimal" compensation because the benefits to the defaulting carrier were still great. *Cost Data,* 348 I.C.C. at 266. Since the defaulting carrier probably would have operated the line at a loss, compensation should not be based on the directed carrier's profits. Rather, rent should be based on the loss in value of the line to the default-

ing carrier if it had operated the line. That loss was measured by the amount of normalized depreciation on the net book value of the property used during directed service. Further, the ICC ruled that the directed carrier could offset the rent by amounts it expended which benefited the defaulting carrier.

The *Cost Data* ruling was applied to mandatory subsidized directed service over the entire Rock Island system, provided by the Kansas City Terminal Railway Company. *Kansas City Terminal Railway Co.* ("*KCT*"), Directed Service Order No. 1398, 360 I.C.C. 289 (1979).

SSW argues that the ICC should have followed the *Cost Data* and *KCT* orders here. We disagree. Our review of the orders here convinces us that the ICC correctly distinguished between "mandatory" subsidized service and "permissive" unsubsidized service.

The elimination of mandatory service, the Commission found, shifted the balance of benefits and burdens between the directed and defaulting carriers. "A mandatory order imposes a burden on the directed carrier," the Commission ruled, "a permissive order confers a right on the interim operator." *SSW Commission Appeal*, 363 I.C.C. at 256. We agree that the distinction is more than semantic.

> Under a permissive order . . . the conducting of interim operations is within the managerial discretion of the authorized carrier. Therefore, the exercise of the rights conferred in the permissive order implies that the interim operator anticipates receiving net benefits from conducting the authorized operations. The election to conduct interim operations may be based on considerations other than an expectation of direct profits. For example, the Rock Island is being liquidated and interim operations provide potential purchasers with valuable operating experience which helps them assess the traffic and profit potentials of the lines. These benefits are not readily quantifiable and do not necessarily have a direct relationship to profits from interim

operations. Because the operations are presumably beneficial to the interim operator, compensation should be paid for use of the lines. Further, because the nature of benefits derived from permissive interim operations differs from the possible benefits derived from mandatory directed operations, the principles for determining compensation under mandatory orders are not necessarily applicable to unsubsidized, permissive orders.

*SSW Commission Appeal*, 336 I.C.C. at 256. These benefits must have been evident to SSW, as it offered to pay $57 million to buy the Tucumcari line. The Commission gave adequate reasons for departing from its prior precedent. *Chicago & Northwestern Transp. Co. v. United States*, 582 F.2d 1043, 1060 (7th Cir. 1978); *Greyhound Corp. v. I.C.C.*, 551 F.2d 414 (D.C.Cir.1977).

SSW also cites the *Multi-Carrier* order, which ordered unsubsidized service over other Rock Island lines for the same time period as here. *Various Railroads-Directed Service* ("*Multi-Carrier*"). Directed Service Order No. 1462 (March 28, 1980). That order also reserved the Commission's power to set compensation in the absence of agreement. The order stated that the ICC would be guided by certain "general principles" if called upon to set rent. Specifically, the ICC said that it did not expect any rent to exceed one-half of the net revenue derived from operation of any line.

The *Multi-Carrier* order stands alone among the voluntary, unsubsidized orders under section 11125 in not providing for guaranteed rent. The FCC followed *Frisco* in setting compensation for three lines. In contrast, the ICC never set compensation under *Multi-Carrier*. Accordingly, the ICC never had occasion to determine how it would apply its "general principles." Finally, the ICC adequately explained why it believed base rentals to be due, thereby fulfilling its obligation to explain its differences with the "general principles" of *Multi-Carrier*. *Pre-Fab Transit Co. v. United States*, 595 F.2d 384, 387 (7th Cir. 1979). We hesitate to overturn these orders based on one, never-applied, precedent.

### B

Both SSW and the Trustee attack the actual amount of the rental. As expected, SSW says. it is too high, the Trustee, too low. We reject both contentions.

Before the ICC, SSW proposed that it pay no compensation whatsoever to the Rock Island because it expected not to make a profit on the lines. The Trustee replied that the Rock Island should receive an annual rental of 14.4 percent of the value of the property. The Trustee said the value of the property should equal the gross salvage value or going concern value of the property, whichever was greater. It further defined going concern value as equal to the gross revenues generated by the property. The Trustee valued the Memphis-Fordyce line at $19.5 million and the Tucumcari line at $57 million, the contract price for its sale to SSW. The Trustee's formula would have resulted in a yearly rental of about $200,000 per route mile.

The Trustee proposed the same terms for the RTA. The RTA argued it also should pay no rent. It contended that, as a public authority, neither it nor its supporting taxpayers should be burdened with the additional cost of rent for running the unprofitable commuter operation.

Frisco, for its part, offered to pay yearly rent of 10 percent of the depreciated book value of the track it was to use. The Trustee countered with the same proposal it made the SSW and the RTA.

The Commission responded that Frisco's "depreciated book value" offer understated the current fair rental value of property. The Trustee's method of determining the going concern value of the property, on the other hand, "greatly overstate[d] the fair rental value of the property." The Commission held that "fair rental value . . . should be determined on the basis of *net* revenues produced by the property, not gross revenues," so as not to reward the Rock Island for not operating. 363 I.C.C. at 249. Further, the Commission ruled that Frisco's proposed rate of return of 10% was below currently prevailing rates on such investments as government notes and bank

certificates. The Commission said the Trustee's proposed return of 14.4 percent per year was reasonable.

The Commission then proposed a two-part formula with a base rental assessed on route-miles, supplemented by a share of net revenues (profits), if any, derived by the carrier from its operations over the Rock Island tracks. The purpose of the base rental was to assure the Trustee of some payment for the use of the Rock Island property. Participation in net revenues would give the Trustee a return on the value of the property. *Id.* at 248–50.

The Commission set a base rental of $1,250 per route-mile per year. This figure reflected the median between the compensation voluntarily agreed to by the parties in two "former track rental agreements." At one extreme, where sale of the line had been agreed upon, the parties had not provided for rent during pretransfer operations but rather had imposed upon the using carrier the obligations of maintenance and security of the property involved. At the other extreme, a case where interim operations would never lead to a purchase, the compensation was $2,475 per route-mile per year. The Commission stated that the proposed arrangement between Frisco and Rock Island, temporary use without a purchase agreement, but which might ultimately lead to a pruchase agreement, was an "intermediate situation." Therefore, the approximate mid-point of $1,250 per route-mile per year was chosen. *Id.* at 250.

For the second part of the formula, the Commission accepted the Trustee's figure of 14.4 percent as his appropriate share of any net revenues that might be generated by Frisco's operations. Net revenues would be calculated in accordance with the Commission's abandonment regulations, with appropriate adjustments. *Id.*

The Commission indicated that this two-part formula was an "interim resolution based on the best information available to us," which was required

> because of the need to establish some
> level of compensation so that service will

be commenced ... [O]ur conclusions here are not etched in stone. We will entertain petitions and are ready to reconsider this matter if anyone offers a better idea.

*Id.* at 251.

The Commission applied the *Frisco* formula to the RTA and Memphis-Fordyce lines, explaining that they also "involved the use of facilities for which a sale agreement had not been reached." Supp. Order No. 2, Directed Service Order No. 1437 at 3; Supp. Order No. 2, Directed Service Order Nos. 1453 and 1456 at 6.

The Commission's rejection of the Trustee's proposal was not arbitrary. The Trustee based his formula on the market value or fair rental value of the property. But, as Frisco points out, there was no "market" for these properties. Further, the data RI submitted was obviously incomplete; some of the leases it submitted as examples covered very high traffic areas.

The orders here were issued under admittedly hurried conditions. SSW and the Trustee argue nevertheless that the Commission's formula was arbitrary because it did not take into consideration the circumstances of each line. But the ICC was entitled to find a formula which it would apply to several carriers. *See, e. g., Chicago & Northwestern Rwy. Co. v. Atchison, Topeka & Santa Fe Rwy. Co.*, 387 U.S. 326, 340–42, 87 S.Ct. 1585, 1593–94, 18 L.Ed.2d 803 (1967) (Commission entitled to make findings on a group basis for rate divisions). The ICC could properly conclude that compensation for this two month period should not be tied to the circumstances of each line. If it were, the almost-certain long delay before the ICC might have doomed directed service before it began. *Id.* at 342, 87 S.Ct. at 1594. Frisco, for one, stated it would not begin directed service until it had a definite answer on the amount of compensation. *Application of St. Louis-San Francisco Railway Company to Perform Temporary Emergency Operation over Various Lines of the Chicago, Rock Island and Pa-*

*cific Railroad Company* (March 11, 1980) at 4–5. Accordingly, it was no abuse of discretion for the agency to refer to two "sample" leases in setting out the base rental.

The pressured circumstances under which the ICC made its decisions were aggravated by the parties' conduct. Every party here was under a duty to assist the ICC in making its decisions. Nevertheless, neither SSW nor Rock Island behaved in a reasonable manner. On notice since at least March 6, 1980 [12] that it would be expected to pay *some* rent to Rock Island, SSW stubbornly refused to offer to pay anything at all. And Rock Island, its proposed formula rejected once, continued to press for the same formula again and again. Both parties sought reconsideration of the ICC's decisions, but argued only for the same positions. Poised at such extremes, the parties were in a position to attack any decision the ICC made as arbitrary and unsupported. Perhaps this is considered a good position under popular legal games-playing theory, but we think it is irresponsible.

The attitudes of SSW and RI have not improved before this court. Reading the parties' briefs and reviewing the record, we are not surprised that the Commission viewed itself as an arbitrator between competing interests. Setting a price between Scrooge and Shylock would require no less.

In saying this, we do not mean to endorse the Commission's approach. *Compare National R.R. Passenger Corp. v. I.C.C.*, 610 F.2d 865, 879 (D.C.Cir.1979); *National R.R. Passenger Corp. v. I.C.C.*, 610 F.2d 881, 886 (D.C.Cir.1979). The ICC is not an arbitrator. The Commission's willingness to characterize itself as one only encourages the parties to take unreasonable positions. We hold only that, under the circumstances, the ICC acted within its proper authority in formulating the *Frisco, RTA,* and *Memphis-Fordyce* compensation orders.

SSW also attacks the Tucumcari formula as arbitrary and irrational. The Commis-

---

12. The date the ICC issued Temporary Authority Order No. 1415, granting SSW temporary authority over the Memphis-Fordyce line under 49 U.S.C. § 11123.

sion found the *Frisco* rationale and formula inappropriate for determining compensation for the Tucumcari line since the parties had entered into an agreement setting a value on the line—$57 million. "[W]e believe an appropriate rental should provide the Trustee with a reasonable return on the agreed value of the property," the Commission held. Supp. Order No. 2, Directed Service Order Nos. 1453 and 1456 (April 25, 1980) at 8. The Trustee proposed a rate of return of 14.4 percent per year on the value on the line. The Commission commented:

> That rate of return is reasonable in today's financial markets for conservatively invested liquid assets. The Tucumcari line, however, is not a liquid asset. It is commercial rail property subject to sale agreement. Therefore, it is not readily disposable for cash. We believe that the rate of return on the value of the line should be lower than that for liquid assets.

*Id.*

The Commission noted that there had been great fluctuations in recent rates of return. The Commission then proposed a formula which would take into account both the illiquid nature of the asset involved and the volatile nature of current rates of return:

> Considering these factors, we conclude that a reasonable return on the value of the Tucumcari Line should be set at a rate of 2 percentage points below the average yield . . . of marketable securities of The United States Government having a duration of 90 days.

*Id.* at 8–9 (footnote omitted).

The Commission also recognized that SSW would be expending substantial sums to maintain the Tucumcari line. The sales contract imposed a duty on SSW, however, to preserve the value of the line pending its transfer. Weighing these factors, the Commission permitted SSW to credit the sums expended by it during these temporary operations for maintenance and security of the line against the rental payments, but limited the credit to no more than 50 percent of the total rent. *SSW Commission Appeal*, 363 I.C.C. at 261.

The Commission's order concerning the Tucumcari line was also not arbitrary and capricious. The ICC's decision took into account the value of the line, a reasonable rate of return to Rock Island, and the amount of SSW's expenditures for upkeep of the line. The ICC thus took into consideration all the relevant factors and the benefits and burdens on each party. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402 at 416, 91 S.Ct. 814 at 823, 28 L.Ed.2d 136.

SSW argues no base rental is appropriate because it is assuming Rock Island's public service obligations and because the Rock Island benefits from directed service. In ruling that compensation should be paid when unsubsidized service is provided, the Commission weighed the benefits to and burdens on the respective parties. SSW's argument is addressed to the proper weight of the benefits and the burdens, a task properly left to the ICC. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. at 416.

Because of the narrow scope of our review, we need not discuss the other details of the parties' objections. Our review shows that the ICC gave reasonable explanations for its decisions. The line it drew was obviously a close one. We cannot say that the resulting formulas were arbitrary, even if other formulas would also be reasonable.[13]

The orders appealed from are

AFFIRMED.

---

13. The record reveals that at least RTA and SSW have been granted additional temporary authority under RITA. Supp. Order No. 3, Directed Service Order No. 1437 (May 30, 1980); Service Order No. 1473 (May 30, 1980). These orders also call for payment of compensation to RI. In our view, the orders under review do not bind the ICC in making future compensation orders because of the hurried circumstances under which they were issued. But we caution that we will not welcome a repeat performance of the parties' positions here should they again appeal.