CUDAHY, Circuit Judge.
The demise of a failing railroad parallels that of a patient with an incurable disease. The one dimension in which this comparison is most inapt, however, is in the measure of value of the respective corpora approaching, at and following death. Human remains— however revered — are of slight economic value. Not so the residual property — real and personal — of a once vital railroad enterprise. In the case of failing railroads, death (and the prospect of liquidation) confers value. The manner in which the corpus of an expiring (or expired) railroad is to be viewed for legal and economic purposes when subjected to “directed use” by a government agency furnishes the subject of this appeal.
On September 26, 1978, the Interstate Commerce Commission (the “ICC”) concluded that the Chicago, Rock Island & Pacific Railroad Company (the “Rock Island”) was “suffering from a lack of cash which [made] its continuing operations impossible in the face of national transportation requirements" [1] and directed the Kansas City Terminal Railway Company (“KCT”) to provide rail service for traffic originating or terminating on the Rock Island lines pursuant to 49 U.S.C. § 11125(a)(1) (1979). The trustee, creditors and shareholders of the Rock Island seek review of that order and two additional orders[2] which extended directed service for a total of 171 days and denied compensation to the Rock Island for the use of its lines unless directed service resulted in a profit for KCT. Petitioners contend that in the absence of an unconditional rent agreement, directed service over a “cashless” railroad constitutes a taking of private property without just compensation in violation of the fifth amendment. Petitioners also challenge several supplemental ICC orders as invalid, arbitrary, unreasonable and contrary to law. These orders, issued to facilitate directed service, authorized KCT to repair and rehabilitate Rock Island tracks and equipment and to offset the expense of these activities against amounts KCT concededly owed the Rock Island for use of locomotives, freight cars and fuel. For the reasons set forth below, we conclude that no fifth amendment taking occurred here essentially because the ICC was fulfilling the Rock Island’s common carrier obligation. Petitioner’s objections to the supplemental ICC orders regarding repair and maintenance of the Rock Island lines and equipment are premature in the absence of a final accounting of the costs of directed service, and we express no opinion on these objections at this time.
I.
A. History of Reorganization
The ICC’s order directing service over the Rock Island lines was the culmination of a *1229 four and a half year effort to save a dying railroad. In March of 1975, the Rock Island filed a petition for reorganization under Section 77 of the Bankruptcy Act. 11 U.S.C. § 205 (1974). Despite the creditors’ demands for immediate liquidation, the court determined that an income based reorganization of the railroad was not clearly impossible. The Rock Island continued to operate under the direction of trustee William M. Gibbons (the “Trustee”) while attempts were made to formulate a viable reorganization plan for the bankrupt railroad.
In an effort to stimulate recovery, the court authorized substantial capital expenditures to repair the Rock Island’s dangerously deteriorated track and equipment. The Trustee sought additional assistance from the Federal Railroad Administration (“FRA”) but received a disappointing response. The FRA denied the Trustee’s request for federal rehabilitation funds amounting to more than $130 million. The agency did, however, approve a priority loan of $17.5 million in 1976, and later authorized a subordinated loan of $33.5 million for equipment repair.
Unfortunately, these efforts did little to arrest the decline of the Rock Island. Between March 1975 and June 1979, the railroad suffered losses totalling more than $157 million. In July of 1979, the FRA conducted an extensive survey of Rock Island facilities. “Over 50 percent of the main line track was inspected and one quarter of that track was found to be below Class 1 standards, which by law cannot be operated. Equipment maintenance was found to be dismal.” The FRA concluded that it could no longer grant waivers to its track standards to the Rock Island “since there [was] no prospect of the lines being brought up to minimum standards.”
On August 28, 1979, the Brotherhood of Railway and Airline Clerks struck the Rock Island. Although the Trustee attempted to continue essential rail service using management personnel, substantial amounts of harvested grain which required immediate shipment could not be transported by the Rock Island.[3] The ICC met on September 18, 1979, to consider directing service by another carrier over the Rock Island lines in an effort to relieve a growing transportation crisis. The Commission determined that it needed more information and adjourned without taking action. Two days later, President Carter exercised his power under Section 10 of the Railway Labor Act (45 U.S.C. § 160) and appointed an Emergency Board to intervene in the Rock Island labor dispute. The striking workers were thus temporarily required to return to their jobs. When the Trustee refused to pay the prevailing wage, however, the employees refused to return to work. The United States subsequently failed to take action to enforce the President’s order, and Rock Island operations were effectively shut down.
The Trustee appeared before the reorganization court on September 21, 1979, to report on the financial condition of the railroad. At that time, Rock Island creditors and stockholders argued that the strike had totally depleted the railroad’s cash reserves and that the court could not constitutionally require the carrier to continue operations. The Trustee insisted that the Rock Island had sufficient cash to operate and succeeded in convincing the reorganization court that an income based reorganization was still not impossible. The FRA concluded, however, that the Trustee’s financial analysis was “unreliable and unresponsive to the company’s service obligations.” Secretary of Transportation Neil Goldschmidt therefore urged the ICC to direct service over the Rock Island lines.
B. The Directed Service Orders
In order to protect the public interest in adequate uninterrupted rail service, the ICC has authority to direct a rail carrier *1230 (the “directed carrier”) to transport traffic over the lines of another carrier (the “defaulting carrier”) for a limited period (not to exceed 240 days) when the ICC determines that the defaulting carrier cannot transport the traffic offered to it because, inter alia, “its cash position makes continuing operations impossible.” 49 U.S.C. § 11125(a) (1979).[4] The ICC then issues instructions to the directed carrier covering the handling, routing and movement of rail traffic on the lines of the defaulting carrier. The Commission is prohibited, however, from ordering service which would violate federal railroad safety standards or would substantially disrupt the directed carrier’s own rail operations. 49 U.S.C. § 11125(b)(2)(A) and (B) (1979). The directed carrier is responsible for accounting to the ICC for the cost of direct service [5] but is entitled to government reimbursement for all expenses which exceed directed service revenue. 49 U.S.C. § 11125(b)(5) (1979).
On September 26, 1979, the ICC issued Directed Service Order No. 1398 which authorized KCT to provide rail service over the Rock Island lines for a 60-day period. The Commission based its order upon the finding that the Rock Island’s cash position, independent of the strike situation, made continuing operations impossible. An estimated $30 million was needed to restore full service to the Rock Island following the strike, and this figure did not include “approximately $4 million in wages owed to employees for services performed prior to . . . [the] strike, . . . $22.4 million in invoices payable, $11 million of which [were more than] 60 days [overdue]” and an anticipated $35 million in costs of track rehabilitation necessary to comply with minimum federal safety standards. The Department of Transportation refused to provide additional federal assistance under the Emergency Rail Services Act and, without such aid, the Rock Island Trustee lacked sufficient cash to resume full operations “in time to meet the immediate needs of Rock Island shippers.” Therefore, the ICC ordered KCT to service virtually all Rock Island traffic during the initial 60-day period with priority being given to commuter lines and grain shipments.
Instructions for implementing and administering directed service operations were also included in the Commission’s order. KCT was required to compensate the Trustee for the use of available Rock Island locomotives, freight cars, fuel and maintenance equipment.[6] The order relieved KCT *1231 of any rent obligation for the use of Rock Island track and facilities unless the directed service operation proved profitable. The ICC had determined as a matter of policy that directed service confers substantial benefits on the defaulting carrier sufficient to discharge any rent obligation in the “usual” situation where a directed carrier’s costs exceed the revenues generated by the service.[7] In the instant case, the ICC concluded that directed service would provide at least three major benefits to the Rock Island:
1) The Rock Island would avoid incurring any additional operating losses which would further impair the interests of the creditors and shareholders;
2) KCT would maintain and “possibly upgrade” Rock Island lines and facilities during the directed service period; and
3) KCT would assume employee obligations for those Rock Island employees hired to perform directed service.
In the highly unlikely event that KCT’s directed service operations showed a profit, the ICC ordered KCT to reimburse the Trustee for the use of Rock Island lines and facilities.[8]
Directed Service Order No. 1398 additionally allocated responsibility for the maintenance and rehabilitation of Rock Island lines and equipment. For the period of directed service, KCT was accountable for routine maintenance of Rock Island freight cars and locomotives[9] and for minor rehabilitation of Rock Island lines, rights of way, roadway structures and related facilities.[10] No substantial repairs could be undertaken without prior ICC authorization although the order outlined procedures to obtain such approval.
KCT commenced directed service operations over the Rock Island lines on October 6, 1979. During the 60-day period which followed, the ICC conducted extensive hearings to determine which Rock Island lines provided “essential” service and whether directed service should be continued along those designated routes. On November 30, 1979, the ICC issued a second directed service order extending KCT operations on Rock Island lines for an additional 90 days to avoid “a wide array of economic and transportation dislocations.” Although the ICC concurred with the assessment of the Department of Transportation and the reorganization court that additional time was needed to develop long range solutions to the Rock Island’s financial crisis, the Commission chose not to extend directed service for the maximum 180 days allowed by law. Noting Congressional directives to “economize” on directed service whenever possible,[11] the ICC considered the 90-day period *1232 adequate to permit the development of reorganization plans.[12]
By February 22, 1980, however, it was apparent that more time was needed to arrange a permanent solution to the Roek Island’s situation. The Trustee’s plan for reorganization had been rejected by the district court, which instead directed the Trustee to “commence preparation of a preliminary plan of liquidation.” The absence of such a plan temporarily impeded progress in the sale and disposition of Rock Island lines and required another extension of directed service operations. In addition, Congress had requested time to develop labor protection legislation which was expected to facilitate the purchase of Rock Island lines by other carriers, and the Department of Transportation needed extra time to plan for interim and post-liquidation operation of essential Rock Island lines. The ICC, therefore, ordered the continuation of directed service operations for 21 days but warned that the extension would “totally exhaust” its directed service appropriation of $80 million. Thus, the ICC would be “financially unable to extend directed service after March 23, 1980.”
At the end of directed service operations, the Rock Island’s cash position had not materially improved, and the railroad’s fiscal emergency remained acute. While directed service did alleviate the drain on Rock Island financial resources, it was not designed to infuse new capital into the system or resolve the railroad’s underlying financial problems. On April 24, 1980, in response to an order of the reorganization court, the Trustee filed an application with the ICC to abandon the entire system. In late May, the ICC approved the request, and on June 2, 1980, the reorganization court authorized the abandonment of the Rock Island.
The Trustee, creditors and shareholders of the Rock Island argue on this appeal that the ICC directed service orders constitute a taking of private property for public use which requires just compensation under the fifth amendment. This argument is based on the premise that the Rock Island’s common carrier obligation was terminated when the railroad’s financial condition made it impossible to continue operations. Cashlessness, under this theory, represents a necessary exception to the statutory requirement of administrative approval for the abandonment of rail operations and constitutionally entitles the railroad to withdraw its property from rail operations. Petitioners therefore contend that in the absence of any obligation to maintain service, the government cannot take control of the line and order service through another carrier without providing just compensation for the use of its lines and facilities to the cashless railroad. We conclude, however, that cashlessness did not absolve the Rock Island of its carrier obligations, and that the direction of service, under the circumstances of this case, was not a taking requiring compensation under the fifth amendment. Further, we believe, although we do not decide, that to the extent a taking may have occurred here, benefits were conferred on the Rock Island providing it with adequate compensation.
II.
Petitioners base their fifth amendment argument on the premise that the Rock Island’s common carrier obligation was terminated when the railroad’s cashless condition made it impossible for the carrier to provide service on its own lines. Our analysis thus first requires a determination of the legal impact of cashlessness on the obligation of a railroad to continue to serve the public. In this connection, it is helpful to understand not only the source and scope of a railroad’s public service obligation but also the interplay between a carrier’s obligation and the rights of a bankrupt rail *1233 road’s shareholders and creditors to limit their financial losses.
The obligation of a railroad to serve the public is the counterpart of the privileges granted to it in connection with the provision of rail service for profit over designated routes. In return for government sponsorship and limited monopoly status, railroads have generally been obligated to serve the transportation needs of the public without discrimination. Although regulation of the nation’s rail industry was originally carried on by the individual states, in 1887 the Interstate Commerce Act authorized the creation of the ICC to provide more effective and nationally uniform regulation of the railroads.
The ICC’s duties, which were initially confined primarily to rate regulation, were expanded in 1920 when Congress amended the Interstate Commerce Act to install what has been termed the Certificate System. Under this scheme, a railroad was prohibited from constructing, extending or abandoning a line without obtaining a certificate from the ICC providing that the present or future public convenience and necessity required or would be enhanced by such action. Among other things, “the Certificate System provides the legal framework (the contract between the carrier and the public) under which the carrier’s freedom to abandon a line may be regulated.” Graybeal, Reflections on the Golden Spike: A Look at the Bankruptcy Reform Act and Railroad Reorganization, 6 Hastings Con. L.Q. 1107, 1116 (1979).
At about the time that the Certificate System was established, however, the Supreme Court began to define the scope of a rail carrier’s public service obligation in the face of financial loss. In Brooks Scanlon Co. v. Railroad Commission of Louisiana, 251 U.S. 396, 40 S.Ct. 183, 64 L.Ed. 323 (1920), the Brooks Scanlon Lumber Company appealed a court judgment which affirmed an order of the Louisiana Railroad Commission requiring the company to continue to operate a small railroad despite the unprofitability of the line. The Supreme Court reversed, holding that if a railroad continues to exercise the power conferred upon it by a charter from a State, the State may require it to fulfill an obligation imposed by the charter even though fulfillment in that particular may cause a loss.... [But] . . . [i]f the plaintiff be taken to have granted to the public an interest in the use of the railroad, it may withdraw its grant by discontinuing the use when that use can be kept up only at a loss. Id. at 399, 40 S.Ct. at 184.
The Brooks Scanlon principle was subsequently applied for the benefit of a carrier’s creditors and investors in Bullock v. Railroad Commission of Florida, 254 U.S. 513, 41 S.Ct. 193, 65 L.Ed. 380 (1921), where the Supreme Court held that the consequences of a state railroad commission’s order requiring an unprofitable line to continue operations imposed an undue burden on the creditors and shareholders of the small carrier.
Apart from statute of express contract, people who have put their money into a railroad are not bound to go on with it at a loss if there is no reasonable prospect of profitable operation in the future. . . . No implied contract that they will do so can be elicited from the mere fact, that they have accepted a charter from the state and have been allowed to exercise their power of eminent domain. (Emphasis supplied) Id. at 520-21, 41 S.Ct. at 194.
The qualified language in Bullock, however, seemed to acknowledge the intervening creation of the Certificate System.
 Brooks Scanlon and Bullock define the basic limitations upon a modern railroad’s public service obligation in the face of financial loss. See also Railroad Commission of Texas v. Eastern Texas Railroad, 264 U.S. 79, 44 S.Ct. 247, 68 L.Ed. 569 (1924). The constitutional principle embodied in these decisions retains its vitality; a railroad cannot be compelled to continue unprofitable operations indefinitely. A bankrupt railroad’s right to withdraw its lines from service, however, has been qualified by the statutory requirement that a *1234 carrier obtain ICC approval[13] prior to the abandonment of rail service. 49 U.S.C. § 10903 (1979).[14] See Smith v. Hoboken R.R. Co., 328 U.S. 123, 66 S.Ct. 947, 90 L.Ed. 1123 (1946); Thompson v. Texas Mexican Ry. Co., 328 U.S. 134, 66 S.Ct. 937, 90 L.Ed. 1132 (1946). Administrative review “assures that an agency with substantial expertise .. . will provide that the appropriate amalgam of public concerns for rail transport and private rights of property is achieved.” New Haven Inclusion Cases, 399 U.S. 392, 461, 90 S.Ct. 2054, 2093, 26 L.Ed.2d 691 (1970).
The petitioners here argue, however, that cashlessness automatically terminates a railroad’s public service obligation without regard to statutory abandonment procedures. While it is certainly true that cashlessness may make rail operations impracticable, we are not persuaded that this condition is in itself sufficient to authorize abandonment absent compliance with the statutory procedure. Thus, cashlessness may make it impossible for a carrier to continue to provide service over its lines, but it does not extinguish the railroad’s common carrier obligation.
This result is understandable in both legal and economic terms. In the legal or procedural context, abandonment is “a permanent or indefinite cessation of rail service” which terminates the railroad’s public service obligation. ICC v. Chicago & Northwestern Transportation Company, 533 F.2d 1025, 1028 (8th Cir. 1976); General Foods Corp. v. Baker, 451 F.Supp. 873 (D.Md.1978). The ICC has been given the authority to review abandonments primarily to insure that public authorities have a final opportunity to develop plans to prevent serious injury to the public interest through termination of rail service. Thus, the fact that cashlessness and statutory abandonment produce the same practical result — cessation of rail service — does not by any means imply that cashlessness and abandonment have the same legal effect— the termination of the railroad’s public service obligation. Before the termination of the carrier’s service obligation, the ICC must be permitted time and scope to assure that the public interest is considered and protected.[15]
Cashlessness in its effect is thus more like an embargo than like an abandonment. An embargo is a cessation of service instituted by the railroad itself as a temporary emergency measure when for some reason the carrier is unable to perform its duty as a common carrier. ICC v. Chicago, Rock Island & Pacific Railroad Co., 501 F.2d 908, 911 (8th Cir. 1974), cert. denied, 420 U.S. 972, 95 S.Ct. 1393, 43 L.Ed.2d 652 (1975); ICC v. Baltimore & Annapolis Railroad Company, 398 F.Supp. 454, 461 (D.Md.1975); 49 CFR § 1006.1 (1979). In both situations (cashlessness and an embargo), the service obligation is excused through conditions of impossibility, but the obligation is not terminated until the carrier receives the approval of the ICC.
*1235 Viewed as a matter of economics, abandonment represents the final stage in the carrier’s passage from operation to liquidation. Before abandonment, the bankrupt railroad is burdened with a public service obligation which can be fulfilled only at a loss to the creditors and shareholders. If the financial condition of the railroad becomes so desperate that it is unable to continue operations (and is cashless), the burden may be eased somewhat through the imposition of directed service. Some losses continue, however, at least until the certificate of abandonment issues and the public service obligation terminates. At this critical point, the trustee may begin to liquidate railroad property and realize in an important way the value of the railroad assets. Very significantly, petitioners do not argue here that a condition of eashlessness, no matter how severe or disabling, would in and of itself authorize a railroad to commence the liquidation of its property. It goes without saying that the Rock Island, although cashless and unable to provide service through its own efforts, had no authority to proceed to liquidation. That right accrues only upon the termination of the carrier’s public service obligation through the issuance of a certificate of abandonment by the ICC. Thus, cashlessness, from a legal and procedural standpoint, may excuse the carrier’s duty to provide service, but it does not terminate the railroad’s common carrier obligation. Economically, even though such a suspension of the duty to serve may stem losses, it does not eliminate them nor, more significantly, does it confer the great benefit of the right to liquidate.
Moreover, we do not believe that the cases cited by petitioners in support of their argument on cashlessness mandate any different result with respect to a cashless carrier’s obligation to serve the public. In In re Chicago, Milwaukee, St. Paul & Pacific Railroad Co., 611 F.2d 662 (7th Cir. 1979) (hereinafter “Milwaukee Road”) this court said:
a railroad that is cashless cannot be required to continue operating to serve the public interest. .. . The situation represents an exception, recognized in Valuation Proceedings, 439 F.Supp. at 1379, n.49, to the statutory requirement that abandonment or discontinuance of railroad lines requires a finding by the ICC that ‘the present or future public convenience and necessity require or permit the abandonment or discontinuance.’ 49 U.S.C. 10903.
Id. at 669 (citations omitted), petitioners contend that this language permits a cashless railroad to discontinue or abandon service without seeking the approval of either the ICC or the reorganization court[16] as required by statute.[17]
Petitioners, however, misconstrue the import of our decision in Milwaukee Road. Rather than carving out a broad cashlessness exception to statutory abandonment procedures, Milwaukee Road merely resolved a conflict between the reorganization court’s power to bring about a de facto abandonment of rail operations through temporary financial arrangements and the Commission’s exclusive power to authorize *1236 abandonment or discontinuance of rail operations. With the entire Milwaukee Road system on the brink of cashlessness, the trustee petitioned the court for approval of high priority loans to maintain a small, potentially reorganizable core of operations and requested a service “embargo” on the remainder of the system. If the court refused to authorize the loans, all Milwaukee Road operations would have been shut down. On the other hand, approval of the loans would judicially recognize and sanction the cessation of service on a major portion of the system in derogation of the ICC’s exclusive jurisdiction over abandonments.
The district court permitted the issuance of trustee certificates to maintain rail service pending the consideration of a reorganization plan but denied the requested embargo on the ground that the court lacked the authority, independent of the ICC, to countenance such actions. On appeal, this court affirmed the loan authorization and reversed the embargo determination concluding that under the “desperate circumstances” created by the Milwaukee Road’s imminent cashlessness, the district court did indeed have the power to approve the embargo and restrict the use of the loan proceeds to the maintenance of a potentially reorganizable segment of the system. The court resolved what was essentially a jurisdictional dilemma in a manner consistent with the purposes of railroad reorganization. It conceded, however, that “absent the imminent cashlessness of the railroad, [this course of action would have] been an impermissible usurpation of ICC authority. It is permissible here only because the trustee certificates were the only source of cash available to an otherwise cashless railroad.” Id. at 670.
Milwaukee Road thus stands for the proposition that when the authority of the reorganization court to supervise operations of a potentially reorganizable segment of a railroad conflicts with the ICC’s authority to approve service abandonments, the reorganization court has the power to authorize a partial embargo of the carrier’s operations in order to maintain service on the reorganizable segment and forestall the imminent cashlessness of the entire system. This very narrow holding does not change in principle the existing procedures for abandonment. It remains necessary in ordinary course for a carrier to obtain Commission authorization prior to the termination of all or any portion of its service. The Milwaukee Road court merely decided that in an emergency situation, the approval of the reorganization court rather than the ICC would suffice.[18]
In the instant case, the court’s authority to approve a service abandonment is not at issue. The discontinuance of all Rock Island rail operations was a fait accompli caused by the railroad’s cashless state. Cashlessness did not, however, permanently extinguish the Rock Island’s public service obligation. At best, it excused performance by the bankrupt carrier for reasons of impossibility. The ICC then ordered reasonable temporary measures in the form of directed service to discharge the carrier’s public service obligation pending the issuance of a certificate of abandonment.
III.
Petitioners argue that the ICC violated the fifth amendment prohibition against uncompensated governmental taking by directing service over the lines of the cashless Rock Island without paying rent for the use of the carrier’s lines and facilities unless directed service produced a profit. The line between an uncompensated taking of private property and a mere exercise of regulatory authority over property is *1237 admittedly fine. It can only be drawn with precision after a careful examination of the character of the property allegedly taken and the nature of the government’s action which arguably constitutes a taking.
A. The Character of the Property
Entry into and withdrawal from a railroad operation (as well as many other aspects of the railroad business) are events heavily freighted with the public interest and pervasively subject to public regulation. Railroad property is burdened with an obligation to serve tfie public, and that obligation frequently takes precedence over the interests of the owners or creditors of the railroad. While the courts agree that a railroad may not be compelled to operate at a loss indefinitely, it is also well-settled that the rights of the owners are not absolute. The Supreme Court explained long ago that shareholders of a bankrupt carrier
cannot be called upon to sacrifice their property so that a depression proof railroad system might be created. But they invested their capital in a public utility that does owe an obligation to the public. .. . [B]y their entry into a railroad enterprise, [they] assumed the risk that in any depression or any reorganization the interests of the public would be considered as well as theirs.
New Haven Inclusion Cases, 399 U.S. 392, 491-92, 90 S.Ct. 2054, 2109, 26 L.Ed.2d 691 (1970) quoting Reconstruction Finance Corp. v. Denver & R.G.W.R. Co., 328 U.S. 495, 535-36, 66 S.Ct. 1282, 1303, 90 L.Ed. 1400 (1946).
When the continuation of rail service is essential for the protection of the public interest, the courts have also determined that the shareholders’ right to realize the value of the property may be held in abeyance for a reasonable period while a solution, acceptable to both the public and private interests, can be devised. New Haven Inclusion Cases, 399 U.S. 392, 90 S.Ct. 2054, 26 L.Ed.2d 691 (1970); Penn Central Merger Cases, 389 U.S. 486, 88 S.Ct. 602, 19 L.Ed.2d 723 (1967); In re Boston & Maine Corp., 484 F.2d 369 (1st Cir. 1973); In re Valuation Cases, 439 F.Supp. 1351 (Sp.Ct. RRRA 1977); In re Penn Central Transportation Company, 384 F.Supp. 895 (Sp.Ct. RRRA 1974). Thus, the character of the property of a bankrupt railroad is that of property continuously subject to onerous regulation carried on in the public interest. It is relatively difficult to perceive how such property, which is already subject to extensive restrictions as to use and, most importantly, financially burdensome impediments to liquidation, can be the likely subject of a taking by emergency regulatory action.
B. The Nature of the Government Action
In directing service over the lines of a cashless railroad, the ICC orders a financially capable carrier to provide transportation service over the lines of the defaulting carrier for a period of not more than 240 days. This might appear to require extensive alterations in the operation of the defaulting carrier but, in reality, disruption is minimal. The rolling stock, facilities and track of the defaulting carrier continue to be used as though no change had occurred. The employees of the defaulting carrier also continue to perform their duties. When necessary, the directed carrier may supplement the facilities or manpower of the defaulting carrier with additional cars or personnel of its own. But neither the government nor the directed carrier ever takes title to the defaulting carrier’s property or, for that matter, takes anything of currently realizable value to the defaulting carrier at any time during the brief period of directed service.
Until a cashless railroad receives a certificate of abandonment, it is both unable to operate and unable to convert its assets to cash through liquidation. In the absence of directed service, the lines and facilities of the carrier would merely lie fallow and be subject to further deterioration. They are, *1238 in this unused state, of no realizable value to the carrier’s shareholders and creditors. Their underlying value is only potential until abandonment is approved and liquidation can commence. At most then, directed service temporarily postpones the carrier’s opportunity to liquidate its assets and realize their salvage or other value. This postponement involves no recognizable loss to the defaulting carrier because the government is at the same time subsidizing the discharge of the carrier’s public service obligation through directed service. In our view, a temporary delay of this nature, particularly when required by the public’s interest in uninterrupted rail service, does not amount to a fifth amendment taking. See Continental Illinois Bank & Trust v. Chicago R.I. & P. Ry., 294 U.S. 648, 55 S.Ct. 595, 79 L.Ed. 1110 (1935) (delayed enforcement of debenture agreements did not raise fifth amendment problems). Hence, we think neither the character of the property involved nor the nature of the government action suggests a fifth amendment taking requiring compensation.[19]
In addition, we do not perceive the direction of service here by the ICC as a governmental intervention adverse to the Rock Island but rather as governmental action in aid of the Rock Island. Thus, the ICC substitutes the financially capable KCT for the cashless Rock Island in carrying out the obligation of service to the public, which in somewhat different ways, is imposed on both the railroad and the government agency. The ICC’s use does not burden the Rock Island. Its use is, instead, responsive to the Rock Island’s obligation and relieves that railroad temporarily of its own burden to serve.
IV.
In Lehigh and New England Railway Company v. ICC, 540 F.2d 71 (3d Cir. 1976), cert. denied, 429 U.S. 1061, 97 S.Ct. 784, 50 L.Ed.2d 776 (1977), the Third Circuit considered the fifth amendment implications of directed service over a cashless railroad which had not entered reorganization. In that case, representatives of the Lehigh and New England Railway Company (the “Le-high”) obtained an ICC order directing service over its lines after a decline in commercial traffic had caused the carrier to endure substantial operating losses. When the ICC refused to permit the Lefiigh to collect compensation for the directed carrier’s use of Lehigh lines and facilities, the Lehigh petitioned the Third Circuit to set aside the ICC’s directed service order as an uncompensated taking in violation of the fifth amendment.
In rejecting the Lehigh’s argument, the court noted that the ICC had the power to order a carrier which had not obtained a certificate of abandonment to continue to provide service for a limited period despite the carrier’s financial condition. Under these circumstances, the ICC’s action in ordering the carrier to provide service did not constitute a fifth amendment taking because the Commission had only temporarily postponed the abandonment of the defaulting carrier’s lines. Hence, the court reasoned that a fortiori the ICC could authorize another carrier to transport traffic over the lines of a bankrupt carrier, unable or unwilling to continue service, without violating the fifth amendment.
Petitioners attempt to distinguish Lehigh, however, through a comparison of the respective cash conditions of the Lehigh and of the Rock Island. Petitioners argue that *1239 unlike the Lehigh the Rock Island was truly cashless and had no obligation, as a matter of law, to continue to serve the public as a result of this dire financial state. Whatever the facts may be, we do not believe that distinctions among the precise economic circumstances of failing railroads should be the touchstone for decision under the fifth amendment. In the case of both the Rock Island and the Lehigh, the ICC directed service by another railroad when neither of the financially troubled carriers could “transport the traffic offered it because . . . [the] cash position [of these railroads made] continuing operation impossible....” 49 U.S.C. § 11125(a) (1979). Since these are simply factual findings of impossibility, we refuse to engage in dubious distinctions between the stone cold dead and the merely expired. For constitutional purposes, it does not matter whether “cashlessness” or some slightly different state of financial stringency applies. We are satisfied, as was the Third Circuit, that “directed service, when unprofitable and as currently implemented by the ICC, does not constitute a taking for which compensation . . . must be provided.” Lehigh, 540 F.2d at 82.
V.
Petitioners also argue that the proviso in the directed service order permitting the Rock Island to collect compensation for use of its lines and facilities — if directed service produced a profit — was arbitrary, capricious and unreasonable. Since this provision of the order addresses circumstances other than those before us, it has no application to the instant facts, and we need not consider it here. We do not, however, think the provision is unreasonable. If the railroad lines and facilities could be employed profitably, directed service would not represent the discharge of a railroad obligation or the assumption of a railroad burden by other means. Instead, directed service would mean the preemption of a business opportunity and the capture of a business benefit by the ICC. Although petitioners prefer to conceptualize the alleged “taking” as merely the assumption of control over the use of tangibles — the lines and facilities — this viewpoint does not negate the additional reality that the lines and facilities are part of an economic system. Assumption of control of the lines and facilities imports control of the system and its economic product. The character of control is quite different depending upon whether the system confers a benefit or imposes a burden. Hence, we think the distinction made by the ICC with respect to the payment of rent between profitable and unprofitable directed service is not unreasonable.[20]
VI.
During the period of directed service, the ICC authorized KCT to expend a total of almost $2.2 million for repair, rehabilitation and upgrading of certain Rock Island lines and equipment. Under the terms of these orders, amounts expended by KCT for those purposes were to be set off from rental payments concededly owed the Rock Island by KCT under the directed service orders. Petitioners object to these offsets on the grounds that they would work an unjustifiable infringement upon the full and just compensation to which the Rock Island is entitled, because (1) such offsets are not based on rational compensable amounts, (2) the ICC has no authority to direct offsets against debts owed the Rock Island estate, and (3) such offsets are inconsistent with the statutory and regulatory scheme under which directed service is authorized.
We agree with the ICC, however, that these objections to the offset provisions are *1240 not “ripe” for challenge at this time. They lack sufficient finality because they represent only an intermediate stage in the accounting required by the directed service orders. Presumably, the “final accounting report” was filed with the ICC by KCT within 180 days of the end of directed service. This final report was not due until September 19, 1980, and is not part of the record on this appeal.
Until we have before us the accounting between KCT and the Rock Island trustee relating to all aspects of directed service, it would not be possible for us to determine whether the overall effect of the various ICC orders affecting compensation is reasonable. See Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 602, 64 S.Ct. 281, 287, 88 L.Ed. 333 (1944). Since a final accounting has now presumably taken place, we vacate the ICC orders insofar as they approve the offsets and remand to the ICC for further proceedings with respect to the offset obligations not inconsistent with this opinion.
AFFIRMED IN PART, AND VACATED AND REMANDED IN PART.

. Kansas City Term. Ry. Co. — Operate—Chicago R.I. & P., 360 I.C.C. 289 (1979), 44 Fed.Reg. 56,343 (Oct. 1, 1979).

. See DSO No. 1398 (Sub. No. 1) Kansas City Term. Ry. Co. — Operate—Chicago, R.I. & P., 360 I.C.C. 478 (1979), 44 Fed.Reg. 70,733 (Dec. 10. 1979); DSO No. 1398 (Sub. No. 2) Kansas City Term. Ry. Co. — Operate—Chicago, R.I. & P„----I.C.C.-(1979), 45 Fed.Reg. 1776 (Jan. 8, 1980).

. At one point, the ICC noted that at least 1700 of the Rock Island’s grain shippers were “captive” customers served exclusively by the Rock Island.

. 49 U.S.C. § 11125(a) (1979) provides:
(a) When a rail carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission . . . cannot transport the traffic offered to it because—
(1) its cash position makes continuing operation impossible;
(2) transportation has been discontinued under court order, or
(3) it has discontinued transportation without obtaining a required certificate under Section 10903 of this title;
the Commission may direct the handling, routing and movement of the traffic available to that carrier and its distribution over the railroad lines of that carrier by another carrier to promote service in the interest of the public and of commerce.

. The cost of directed service is
“an amount equal to the amount by which . . . total expenses of that carrier incurred in or attributable to the handling, routing and moving the traffic over the lines of the other carrier for the period during which the action of the Commission is effective, including renting or leasing necessary equipment and an allocation of common expenses, overhead and a reasonable profit, exceed . . . the direct revenues from handling, routing and moving that traffic over the lines of the other carrier during that period.”
49 U.S.C. § 11125(b)(5) (1979).

. Directed Service Order No. 1398 provided: The RI Trustee shall be compensated for the use of locomotives and other equipment supplied to the DRC [directed rail carrier] based upon current rail industry lease rates, adjusted for the horsepower of the locomotives and the length of the lease.
If the Trustee believes that current rates do not provide an equitable rental, the DRC may negotiate a different basis (subject to our approval).
Similarly, if KCT used cars or equipment leased by the Rock Island from other carriers, KCT owed the Trustee an amount equal to the appropriate lease payment. KCT compensated the Trustee for Rock Island fuel or supplies used in the performance of directed service, at the current replacement cost of the materials used. To a large extent, these arrangements *1231 imposed no ultimate burden on KCT since KCT was entitled to government reimbursement for all of these costs if directed service proved unprofitable.

. See Implementation of Public Law 93-236, Section 601(e), Regional Rail Reorganization Act of 1973 — Submission of Cost Data to Justify Reimbursement, 354 I.C.C. 351 (1975) [hereinafter "Cost Data”].

. The directed service order provided a somewhat opaque formula for determining the amount of rent owed the Rock Island for the use of its lines if directed service produced a profit. The ICC merely stated:
Such compensation shall be measured by the lessening of the rail property’s operational capability (not to exceed normalized depreciation). The total rent shall be reduced by those amounts expended during the period of directed service that benefited Rock Island.
A more detailed description of the formula can be-found in Cost Data at 256.

. Routine maintenance of equipment included all servicing which
1) did not exceed $250 per unit for freight cars and equipment other than locomotives; or
2) did not exceed $300 per unit for locomotives.

. Minor rehabilitation of lines and related facilities included all repairs which
1) would cost less than $5,000 per mile;
2) could be initiated within 10 days of the effective date of the ICC’s decision; or
3) could be completed within 15 days.

. During the initial 60-day period, directed service operations on the Rock Island incurred a substantial loss. The ICC estimated that government subsidies of Rock Island service amounted to $457 per carload.

. Thé ICC was aware of the district court’s reorganization schedule. The trustee’s proposals were due on December 10, 1979, with final comments expected by January 10, 1980. The Federal Railroad Administration had also developed a recommended timetable for the transfer of Rock Island properties and services to other rail carriers. The Commission considered the FRA’s responsibilities and concluded that the 90-day directed service period was sufficient to develop these purchase and sale plans into final form.

. Under certain limited circumstances, a bankrupt carrier may also obtain approval of service abandonments from the reorganization court. 11 U.S.C. § 1170 (1979). See footnote 18 infra.

. The Commission shall issue such approval only if it “finds that the present or future public convenience and necessity require or permit the abandonment or discontinuance.” 49 U.S.C. § 10903(a) (1979).

. We reject petitioners’ suggestion that the ICC somehow approved the abandonment of Rock Island lines when in the directed service order, it noted that the carrier’s cashless condition made continuing operations impossible. Directed service is designed by its very terms to meet situations where the financial condition of a carrier precludes the continuation of service. The state of financial impossibility which requires temporary recourse to directed service, does not, at the same time, nullify the Rock Island’s own obligation to provide service. Indeed, to hold, as petitioners’ contend, that a state of cashlessness entitles a railroad to cease operations would mean, in effect, that the Commission would be required to grant abandonment as soon as any condition existed that would entitle the Commission to use its directed service powers under 49 U.S.C. § 11125 (1979). There is nothing in the legislative history of Section 11125 to indicate that the Commission’s exercise of its directed service powers was tantamount to a grant of abandonment.

. See note 18 infra.

. We note that petitioners have not discussed the language in footnote 49 of In re Valuation Proceedings, 439 F.Supp. 1351 (Sp.Ct. RRRA 1977) in their briefs, although the case is cited prominently in our Milwaukee Road decision. The footnote in Valuation Proceedings discusses “the prevalent assumption that the trustee of a losing railroad in a § 77 proceeding could disregard § 1(18) of the Interstate Commerce Act [requiring] approval of abandonments.” The court regarded this assumption as erroneous “except when cessation of operations would have been required by cashlessness or other circumstances beyond a trustee’s control.” We believe that this language merely acknowledges the unmistakable fact that the cessation of operations by a cashless railroad occurs of necessity with or without ICC approval. The legal consequences of abandonment, namely the termination of the carrier’s public service obligation and the right to proceed to liquidation, accrue, however, only upon the issuance of a certificate of abandonment. To hold otherwise, would “run counter to the explicit assumption of all courts, including the Supreme Court, in the New Haven Inclusion Cases." In re Penn Central Transportation Company, 384 F.Supp. 895 (Sp.Ct. RRRA 1974).

. The new Bankruptcy Act contains legislative recognition of the Milwaukee Road decision. The reorganization court is now permitted to authorize abandonments when the court, with the advice of the ICC, determines that abandonment is “consistent with the public interest and in the best interest of the estate or essential to the formulation of a [reorganization] plan.” 11 U.S.C. § 1170 (1979).

. Even if we were to regard directed service as a taking of private property for public use, no fifth amendment violation occurs if just compensation is provided to the defaulting carrier. Although petitioners claim that such compensation should take the form of rent to the defaulting carrier for use of its lines and facilities, directed, service provides many other benefits to a defaulting carrier. These benefits include the maintenance of the defaulting carrier’s property, the satisfaction of its employee obligations and a reduction in the operating losses which might otherwise impair the interest of the defaulting carrier’s shareholders and creditors. Since we have determined that no “taking” occurred, we need not determine whether these benefits amounted to adequate compensation. We see no reason on the face of things, however, to disagree with the argument of the ICC that they did.

. This opinion appears, with respect to the “taking” issue, to be consistent with Gibbons v. United States, 660 F.2d 225 (7th Cir. 1981), decided with commendable dispatch by another panel of this court.